[No. B188674. Second Dist., Div. Three. Aug. 27, 2007.]

TIMOTHY LOCKHART, JR., Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES et al., Defendants and Respondents.

## Counsel

Law Offices of Kuhn & Belz, David L. Belz and Mary Luetto Nichols for Plaintiff and Appellant.

Monroy, Averbuck & Gysler, Jon F. Monroy; Pollak, Vida & Fisher, Daniel P. Barer and Anna L. Birenbaum for Defendants and Respondents.

## Opinion

**CROSKEY, J.**—Government Code section 854.8 provides immunity to public entities for injuries to inpatients of mental institutions. Government Code section 855 creates an exception to this liability for injuries "proximately caused by the failure of the public entity to provide adequate or sufficient equipment, personnel or facilities required by any statute or any regulation of the State Department of Health Services,[1] Social Services, Developmental Services, or Mental Health prescribing minimum standards for equipment, personnel or facilities . . . ." In this case, we consider which statutes and regulations are sufficient to trigger liability under Government

---

[1]Subsequent to the events in this case, the State Department of Health Services was reorganized into the Department of Health Care Services and the Department of Public Health. As corresponding amendments have not yet been made to Government Code section 855, and no regulations of the newly reorganized departments are at issue in this case, we use the pre-reorganization terminology in our discussion.

Code section 855. Specifically, we conclude that only statutes and regulations promulgated by the described departments are sufficient; county regulations, federal Medicare regulations, and the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) standards are insufficient bases for liability under Government Code section 855. Moreover, we conclude that only statutes and regulations which "prescrib[e] minimum standards" for equipment, personnel or facilities can create liability; regulations that simply require "sufficient" equipment, personnel or facilities are too broad to fit within the narrow immunity exception of Government Code section 855.

Plaintiff and appellant Timothy Lockhart, Jr., appeals from a summary judgment entered in favor of defendant and respondent County of Los Angeles (County) in this action for the wrongful death of Timothy Lockhart, Sr. (decedent), arising out of decedent's suicide while a patient at County's Augustus F. Hawkins Comprehensive Community Mental Health Center (Hawkins). We conclude plaintiff's complaint is barred by statutory immunity, and therefore affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Hawkins is an inpatient mental health care facility. It is not separately licensed as an acute psychiatric hospital (see Health & Saf. Code, § 1250, subd. (b)), but is the *psychiatric unit* at the Martin Luther King Jr./Charles R. Drew Medical Center (King/Drew). King/Drew is licensed as a "general acute care hospital."

On November 14, 2002, decedent was admitted to Hawkins as an inpatient pursuant to Welfare and Institutions Code section 5150, based on a determination that he was a danger to himself based on a history of suicide attempts.[2]

Decedent underwent a psychiatric evaluation at Hawkins and was admitted as an inpatient for further treatment and evaluation. He was placed on "Level 1 Suicide Prevention Protocol," which required patient checks every 15 minutes. This required the least level of supervision of the three suicide prevention protocols in use at Hawkins. On November 17, 2002, medical staff applied for a further 14-day involuntary psychiatric hold on decedent.

---

[2] Decedent had lived with his mother, and was depressed due to his mother's Alzheimer's disease. Three weeks prior to his admission, he had attempted suicide by overdosing on his hypertension pills. Decedent's mother died one week prior to decedent's admission to Hawkins. Decedent was a suspect in his mother's homicidal death. On November 12, 2002, the day of his mother's funeral, decedent attempted suicide by hanging himself in the garage. Relatives found him and cut him down. Police were called and application was made to detain decedent for 72 hours as a danger to himself. On admission, decedent felt depressed, hopeless, and guilty; he wanted to end his life. Decedent was also suffering from alcoholism.

Decedent was housed in ward B at Hawkins, sharing a four-bed room with three other patients. On November 18, 2002, between 5:30 and 5:45 a.m., decedent was observed by staff to be out of bed and pacing around the room. Sometime after 6:00 a.m., decedent locked himself in the bathroom in his shared patient room and hanged himself with some blankets. When nursing staff knocked on the bathroom door and received no answer, they spotted a piece of bed linen tied in a knot protruding from the top of the bathroom door. They feared another suicide attempt. Nursing staff attempted unsuccessfully to open the bathroom door. However, they did manage to cut through the knot at the top of the door. When the knot unraveled, the fabric slipped back into the bathroom, and a sound was heard from within.

A call was placed to the Los Angeles County Sheriff's Department. The sheriff's department has a station at King/Drew and has officers at King/Drew at all times.[3] Sergeant David Johnson looked at the bathroom doorknob, and recognized it to be a "privacy lock," possessing a safety release which could easily be opened with any small item with a straight edge, such as a flathead screwdriver, a coin, or the rounded portion of any key. Sergeant Johnson opened the lock with the back of a car key. The bathroom door opened a few inches inward, and decedent was discovered with his head hanging approximately one foot above the floor by strips of blanket tied around the inside doorknob. Sergeant Johnson used his knife to cut through the makeshift rope. As he slowly opened the door, decedent then slid down to the ground on his back.

Decedent was not breathing and did not have a pulse. The nursing staff started CPR and called a "Code Blue." The crash cart was stored in the "clean utility room" in ward B. The crash cart was brought into the room approximately one minute after the code was called. Decedent "did show a small trace of a heartbeat on the EKG." He was then taken to the emergency room. He was pronounced dead in the emergency room at 6:39 a.m.

### 1. *Allegations of the Complaint*

On February 6, 2004, plaintiff filed the complaint[4] in this action, alleging a single cause of action for wrongful death. Factually, the complaint implies the

---

[3] In his brief on appeal, plaintiff states that the sheriff's department "is located off-site of the hospital." This is in contrast to the deposition testimony of Sergeant David Johnson, who testified that the County department of health services contracts with the sheriff's department to provide police services in its major hospitals. He further testified that, at the time of the incident, he was the watch commander at King/Drew. Indeed, the sheriff's department incident report regarding decedent's suicide identifies the reporting deputy's "station" as "MLK Hospital."

[4] The complaint names as defendants County and Hawkins as separate entities. County's responsive pleadings indicate they are a single entity.

bathroom door in decedent's room required a key to unlock;[5] all of the evidence in the case subsequently revealed that this was not the case. Legally, the complaint overlooks the broad governmental immunity for injury to inpatients of mental institutions provided by Government Code section 845.8, and makes no attempt to plead a specific exception to the immunity. Instead, the complaint seeks relief for simple negligence. Specifically, plaintiff alleged that County "negligently failed to adequately manage and treat [decedent], who had a known history of attempted suicide, and committed the following negligent acts and/or omissions, among other negligent acts and/or omissions: Failed to adequately supervise [decedent], while an impatient at [Hawkins]; negligently performed a suicide watch on [decedent]; negligently allowed [decedent] to have access to potential instruments for suicide, including bed sheets and blankets; negligently allowed [decedent] to leave his assigned bed without assistance or supervision when [decedent] was on suicide watch; negligently allowed [decedent] access to a bathroom with a locking device when [decedent] was on suicide watch; negligently failed to have a key to the bathroom lock available to its employees and personnel; failed to have adequate policies and procedures for suicide watch and prevention; failed to have adequate protocol for suicide watch and prevention; failed to have adequate protocol and emergency procedures for a patient locking himself into a bathroom, including failure to have a key or other unlocking mechanism available to its agents and employees; failed to identify and institute adequate suicide watch and prevention; and failed to adequately train its agents and employees in suicide watch and prevention, among other failures."[6] In contrast to arguments plaintiff would subsequently make, plaintiff did *not* allege in his complaint that Hawkins had insufficient nurses or psychiatrists on staff at the time of decedent's death, or that the crash cart had been stored too far away from decedent's room.

Similarly, on July 8, 2004, plaintiff served answers to interrogatories. When asked to identify all facts on which he based his contention that County was negligent in decedent's care, plaintiff did not identify insufficient staffing, or a poor location of the crash cart. Plaintiff instead focused on his

[5] Plaintiff alleged that the nursing staff "spent approximately thirty (30) minutes attempting to open the locked door, as there was no door key available to the employees."

[6] Similarly, plaintiff alleged that County knew, or should have known, of the serious risk of decedent harming himself, and "failed to take adequate steps and precautions to prevent [decedent] from committing suicide by adequately monitoring and supervising [decedent] while on suicide watch; to institute proper restraint procedures for an individual on suicide watch; to prevent [decedent] from having access to materials that could be used to commit suicide, such as bed sheets and blankets; to prevent [decedent] from leaving his assigned bed without assistance and supervision, and to prevent [decedent] from having access to a bathroom with a locking device, which prevented agents and employees of [the County] from opening the locked door for a period of approximately thirty (30) minutes and which prevented medical personnel from instituting resuscitation efforts for such a lengthy time that [decedent] died from his injuries."

allegations that decedent had not been placed on a more restrictive suicide prevention level, and that the nursing staff had not complied with the 15-minute checks required by the suicide prevention level on which he had been placed. As to the issue of the lock on the bathroom door, plaintiff stated as follows: "Several members of the hospital staff attempted to unlock the door of the restroom, but failed to do so. Yet when the police officer, Sergeant Johnson, arrived on the scene he was able to unlock the door with ease, reporting that the lock on the door has a safety release mechanism that does not require a key. *Plaintiff believes that the members of the hospital staff should have been aware of this, or should have had a key to the door.*" (Italics added.) Notably, plaintiff did not assert negligence in the fact that the door had a privacy lock on it.

### 2. *County's Motion for Summary Judgment*

On November 12, 2004, County moved for summary judgment on the basis of the absolute immunity provided by Government Code section 854.8. Additionally, County argued that its employees acted at all times within the standard of care.

### 3. *Plaintiff's Initial Opposition*

On August 25, 2005, plaintiff filed his first opposition to the summary judgment motion. As to the issue of standard of care, plaintiff introduced expert affidavits indicating County's doctors and nurses had acted below the standard of care. County effectively conceded that plaintiff's evidence raised a triable issue of fact on this issue, and it was not a basis on which the trial court subsequently granted summary judgment.

In opposition to the assertion of immunity, plaintiff conceded that Hawkins "is the type of facility set forth in the immunity statute."[7] However, plaintiff

---

[7] We have noted that Hawkins is not an acute psychiatric hospital, but the psychiatric unit of a general acute care hospital. Government Code section 854.8 extends immunity to public entities for injuries to inpatients of a "mental institution." "Mental institution" is defined, for the purposes of this statute, as including any "county psychiatric hospital." (Gov. Code, § 854.2.) A "county psychiatric hospital" is defined as "the hospital, ward, or facility provided by the county pursuant to the provisions of Section 7100 of the Welfare and Institutions Code." (Gov. Code, § 854.3.) That section indicates that the board of supervisors of each county "may maintain in the county hospital or in any other hospital situated within or without the county or in any other psychiatric health facility situated within or without the county, suitable facilities and nonhospital or hospital service for the detention, supervision, care, and treatment of persons who are mentally disordered, developmentally disabled, or who are alleged to be such." (Welf. & Inst. Code, § 7100.) It is clear, then, that the psychiatric *unit* of a general acute care hospital may be a "mental institution" for the purposes of Government Code section 854.8.

asserted that the exception to immunity set forth in Government Code section 855, subdivision (a) applied. That subdivision provides as follows: "A public entity that operates or maintains any medical facility that is subject to regulation by the State Department of Health Services, Social Services, Developmental Services, or Mental Health is liable for injury proximately caused by the failure of the public entity to provide adequate or sufficient equipment, personnel or facilities required by any statute or any regulation of the State Department of Health Services, Social Services, Developmental Services, or Mental Health prescribing minimum standards for equipment, personnel or facilities, unless the public entity establishes that it exercised reasonable diligence to comply with the applicable statute or regulation." (Gov. Code, § 855, subd. (a).)

Plaintiff identified several statutes, regulations, and other sources of authority which he alleged County had violated in decedent's care, thereby purportedly justifying liability under Government Code section 855.[8] We discuss each group of regulations separately.

As to minimum standards for *equipment*, plaintiff relied on California Code of Regulations, title 22, section 71611, which provides that, in *acute psychiatric hospitals*, "patients' rooms shall not be kept locked when occupied," except where approved, and that, "[w]here patients are kept in locked wards or rooms, adequate staff must be available to assure safe and quick egress of the patients." (Cal. Code Regs., tit. 22, § 71611, subds. (e), (g).) Plaintiff argued these regulations were violated by the locking bathroom door and by the fact that the nursing staff did not "have immediate access to a key or means of opening that locked bathroom door." Plaintiff also relied on California Code of Regulations, title 22, section 70581, which provides that, in psychiatric units of general acute care hospitals, "Resuscitative and cardiac monitoring equipment shall be in or readily available to the unit." (Cal. Code Regs., tit. 22, § 70581, subd. (b).) Plaintiff argued this regulation was violated because, after the bathroom door had been opened "a crash cart had to be located off the ward and brought to [decedent's] room, thereby wasting valuable time for resuscitation."

As to minimum standards for *personnel*, plaintiff relied on California Code of Regulations, title 22, section 70579, which sets forth requirements for the psychiatric unit staff at a general acute care hospital. Subdivision (a) of that

---

[8] Additionally, plaintiff made numerous arguments which had no statutory or regulatory underpinnings. For example, plaintiff argued that County was liable under Government Code section 855 due to its failure to provide "adequate facilities with which to house patients suffering from suicidal tendencies," and again relied on allegations that Hawkins's staff had failed to "adequately assess [decedent's] suicide risk." As the plain language of Government Code section 855 requires a statutory or regulatory basis for any prescribed minimum standards allegedly breached, these arguments are clearly insufficient to justify liability.

regulation provides that "[i]f a psychiatrist is not the administrative director of the psychiatric unit, a psychiatrist who is certified or eligible for certification . . . shall be responsible for the medical care and services of the unit, including all those acts of diagnosis, treatment, or prescribing or ordering of drugs which may only be performed by a licensed physician." (Cal. Code Regs., tit. 22, § 70579, subd. (a).) Plaintiff argued this subdivision was violated because decedent had only been treated by a medical resident and that there was "no evidence that a licensed psychiatrist ever reviewed the care plan . . . or ever examined the patient." Subdivision (e) of that regulation provides that "[t]here shall be sufficient nursing staff, including registered nurses, licensed vocational nurses, licensed psychiatric technicians and mental health workers to meet the needs of the patients." (§ 70579, subd. (e).) Plaintiff argued this subdivision had been violated because "there was inadequate nursing staff on the shift during which time [decedent] committed suicide." Plaintiff argued that Hawkins was understaffed according to its *own* requirements for nursing staff, in that, according to hospital duty sheets, Hawkins was short one licensed vocational nurse that night, who had been replaced by an unlicensed nurse's aide.[9] Finally, subdivision (g) of the regulation provides that "[a] social worker shall be employed on a full-time, regular part-time or consulting basis." (§ 70579, subd. (g).) Plaintiff argued this subdivision was violated because Hawkins had failed "to have a social worker participate in the care plan" for decedent.

As to minimum standards for *facilities*, plaintiff asserted that Hawkins was under an obligation to comply with JCAHO standards, which were purportedly breached by Hawkins's insufficient safety plans.

Additionally, plaintiff relied on Health and Safety Code section 1250.2, subdivision (d), which provides that a psychiatric health facility *shall be eligible to participate* in the Medicare program *if* the facility is in compliance with federal statutes and regulations regarding Medicare participation. Plaintiff argued that this statute actually *required* County to comply with such federal statutes and regulations. Plaintiff argued that multiple violations of federal statutes and regulations supported liability.[10]

---

[9] Plaintiff also noted that one of the nurses' aides had briefly left the ward at the time of decedent's suicide.

[10] Plaintiff did not specifically identify any such violations in his opposition, but simply referred to the entirety of the 23-page declaration of his expert. Similarly, plaintiff's summary judgment opposition also quoted at length from California Code of Regulations, title 22, section 70577, which sets forth "General Requirements" for psychiatric units in general acute care hospitals. After quoting the regulation, plaintiff simply states, "the declarations of plaintiff's experts identify multiple violations of this code [*sic*] section."

### 4. *County's Reply*

County filed a reply in support of its motion, arguing that plaintiff had no evidence that it had violated any statute or regulation which would invoke the exception to immunity.

Specifically, as to *equipment*, County argued that the cited regulations prohibiting locks on *patient room doors* did not prohibit privacy locks on *bathroom* doors. Moreover, while the nursing staff might have been ill informed as to how to open the privacy lock, County argued that such lack of knowledge could not violate a regulation regarding equipment. As to the crash cart, County argued that the evidence showed that it had been stored within the psychiatric unit—and, indeed, within ward B—which met the regulatory requirement.

As to *personnel*, County argued that the requirements of California Code of Regulations, title 22, section 70579 simply indicate the necessary *composition* of the staff of a psychiatric unit, not the individuals who must be involved in each patient's care. As to the contention that there were insufficient nurses, County argued that the regulation requiring "sufficient nursing staff" to meet patient needs did not set forth any minimum requirement as to the number of nurses. County contrasted this with California Code of Regulations, title 22, section 70217, a regulation adopted subsequent to the events in this case, which sets forth specific minimum nurse-to-patient ratios in each unit of a general acute care hospital. Subdivision (a)(13) of that regulation states, "The licensed nurse-to-patient ratio in a psychiatric unit shall be 1:6 or fewer at all times." (§ 70217, subd. (a)(13).)

As to *facilities*, plaintiff had relied only on the JCAHO standards. County argued that JCAHO standards were not mandatory under any statute or regulation, but were simply the standards established by JCAHO, a private nonprofit organization with no power to promulgate binding regulations.

### 5. *First Summary Judgment Hearing*

At the first summary judgment hearing, argument ultimately centered on whether JCAHO standards were mandatory under any controlling statute or regulation. The parties were granted permission to submit additional briefs addressing the issue.

### 6. *Plaintiff's Second Opposition*

Plaintiff's argument that JCAHO standards applied was based on JCAHO's relationship to Medicare. Hospitals participating in Medicare can be considered exempt from routine surveys to confirm their compliance with Medicare's conditions of participation if the hospitals are accredited by an

accreditation organization. An accreditation organization can issue accreditations which exempt hospitals from routine compliance surveys if the accreditation organization requires its hospitals "to meet requirements that are at least as stringent as the Medicare conditions of participation." (67 Fed.Reg. 13344.) JCAHO is approved as a Medicare accreditation organization. Any hospital accredited by JCAHO is "deemed to meet" all Medicare conditions of participation, and Medicaid conditions as well.[11] (42 C.F.R. § 488.5(a) (2006).)

Plaintiff argued that since Hawkins participated in Medicare, Hawkins was required to comply with Medicare regulations and was "thus" required to meet JCAHO requirements. Similarly, plaintiff noted that California regulations require counties to make certain that their providers have complied with necessary Medicaid regulations. (Cal. Code Regs., tit. 9, § 1729.) Plaintiff argued that this, too, required JCAHO compliance.

### 7. *County's Second Reply*

County replied that under the plain language of Government Code section 855, only statutes and regulations of the State Department of Health Services, Social Services, Developmental Services, or Mental Health were bases for liability. As federal Medicare regulations fell outside the plain language of the statute, County argued that those regulations could not be used to avoid immunity. In any event, County noted that JCAHO accreditation was simply a voluntary alternative means of proving a hospital met Medicare conditions of participation, and was not a Medicare requirement. Finally, County established that JCAHO had not been approved as a Medicare accreditation organization until *after* decedent's death.[12]

### 8. *Plaintiff's Third Opposition*

While the parties were preparing their second round of briefing, plaintiff discovered additional regulations which he felt applied. The parties therefore stipulated to additional briefing on the issue of door locks.[13]

---

[11] The hospital is deemed to meet Medicaid conditions only when all that is required for Medicaid is to meet Medicare conditions of participation.

[12] County also noted that King/Drew was, in fact, accredited by JCAHO during the time in question. Thus, County questioned plaintiff's expert's ability to argue that Hawkins had failed to meet JCAHO standards, given JCAHO's approval.

[13] Although the supplemental briefing was to be limited to the issue of door locks, plaintiff also raised additional regulations purportedly governing the issue of inadequate nursing staff. Plaintiff relied on California Code of Regulations, title 22, section 77061, which sets forth specific nursing staff requirements for *psychiatric health facilities*, and California Code of Regulations, title 9, section 1111, which sets forth nursing staff requirements for *county mental*

Plaintiff's third opposition cited to California Code of Regulations, title 9, section 787.25, which applies to *mental health rehabilitation centers*. That regulation provides, in part, "Clients' rooms shall not be locked except for rooms approved by the Department [of Mental Health] for seclusion of clients." (§ 787.25, subd. (b).)

### 9. *County's Third Reply*

In reply, County emphasized that King/Drew was licensed as a general acute care hospital, and that Hawkins was simply the psychiatric unit in such a hospital. County argued, therefore, that regulations governing mental health rehabilitation centers did not apply to Hawkins. County identified California Code of Regulations, title 22, section 70811 as the regulation governing requirements for patient rooms in general acute care hospitals. That regulation states, "Except in rooms approved by the Department for detention and for psychiatric patients, patients' rooms shall not be kept locked when occupied." (Cal. Code Regs., tit. 22, § 70811, subd. (e).) It is silent as to bathroom doors.

### 10. *Plaintiff's Fourth Opposition*

Subsequently,[14] plaintiff filed an additional opposition, arguing that the Government Code section 855 exception to governmental immunity for the violation of statutes or regulations of the State Department of Health Services, Social Services, Developmental Services, or Mental Health should be interpreted to apply to the violation of *federal* regulations. Plaintiff then reasserted his argument that since County was a Medicare provider, it was required by federal regulations to comply with JCAHO standards.

### 11. *Ruling and Judgment*

The trial court then granted the motion for summary judgment, on the basis of governmental immunity. On October 14, 2005, judgment was entered in favor of County.

### 12. *Motion for Reconsideration/New Trial*

On October 19, 2005, plaintiff filed a motion for reconsideration, which the trial court ultimately considered as a motion for new trial. Plaintiff represented that he had only recently discovered further authority which he argued

---

*health agencies in correctional treatment centers.* Neither regulation applies to psychiatric units in general acute care hospitals.

[14] It appears that a hearing on the motion for summary judgment was held on September 22, 2005. Plaintiff has not included the reporter's transcript of that hearing on appeal. The result of that hearing, however, was an additional round of briefing.

created a basis for liability under Government Code section 855. Specifically, plaintiff relied on a manual of standards and practices promulgated by the County's own department of health, entitled "LPS[15] Designation Standards and Process For Facilities" (hereafter County Manual). Plaintiff argued that the standards set forth in the County Manual itself were violated, and that the County Manual obligated Hawkins to comply with federal regulations and JCAHO standards.[16]

### 13. *Plaintiff's Ex Parte Application to Consider New Evidence*

After County had filed its opposition, but prior to the hearing on the motion for reconsideration, plaintiff filed an application for an order to consider new evidence. Specifically, plaintiff had recently obtained the JCAHO standards that had been in effect in 2002. The relevant JCAHO standard regarding door locks reads as follows: "The hospital establishes an environment that meets the needs of patients, encourages a positive self-image, and respects their human dignity." The "intent" of that standard reads, in part, "Door locks and other structural restraints used are consistent with the patient's needs, program policy, law, and regulation. All locking devices used are consistent with the requirements of the *Life Safety Code* . . . . Emergency access provision is provided to all locked occupied spaces. Based on the population served, locking may include an entire patient unit or an individual bedroom or bathroom."

### 14. *Ruling and Appeal*

On December 15, 2005, the trial court denied the motion for new trial. On January 12, 2006, plaintiff filed a notice of appeal.

### ISSUES ON APPEAL

This appeal presents three principal issues: (1) Does the exception from immunity provided by Government Code section 855 apply only to violations of statutes and regulations of the State Department of Health Services, Social Services, Developmental Services, and Mental Health, or can it be extended to include federal regulations, JCAHO standards, and a defendant county's own manuals? (2) Can statutes or regulations setting forth *general* requirements of "sufficient" equipment, personnel or facilities be considered regulations "prescribing minimum standards for equipment, personnel or facilities,"

---

[15] "LPS" refers to the Lanterman-Petris-Short Act, which governs the involuntary commitment of mentally disordered individuals. (Welf. & Inst. Code, § 5000 et seq.)

[16] Additionally, the County Manual required compliance with the 1997 Life Safety Code promulgated by the National Fire Protection Association. Plaintiff argued that Hawkins violated the 1997 Life Safety Code, and that such violation constituted a basis for liability under Government Code section 855.

the violation of which triggers the exception from immunity? (3) Has a triable issue of fact been established with respect to any statutes or regulations applicable in this case?

## DISCUSSION

### 1. Standard of Review

" 'A defendant is entitled to summary judgment if the record establishes as a matter of law that none of the plaintiff's asserted causes of action can prevail.' (*Molko* v. *Holy Spirit Assn.* (1988) 46 Cal.3d 1092, 1107 [252 Cal.Rptr. 122, 762 P.2d 46].) The pleadings define the issues to be considered on a motion for summary judgment. (*Sadlier* v. *Superior Court* (1986) 184 Cal.App.3d 1050, 1055 [229 Cal.Rptr. 374].) As to each claim as framed by the complaint, the defendant must present facts to negate an essential element or to establish a defense. Only then will the burden shift to the plaintiff to demonstrate the existence of a triable, material issue of fact. (*AARTS Productions, Inc.* v. *Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064–1065 [225 Cal.Rptr. 203].)" (*Ferrari v. Grand Canyon Dories* (1995) 32 Cal.App.4th 248, 252 [38 Cal.Rptr.2d 65].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) We review orders granting or denying a summary judgment motion de novo. (*FSR Brokerage, Inc. v. Superior Court* (1995) 35 Cal.App.4th 69, 72 [41 Cal.Rptr.2d 404]; *Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653].) We exercise "an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law." (*Iverson v. Muroc Unified School Dist.* (1995) 32 Cal.App.4th 218, 222 [38 Cal.Rptr.2d 35].)

### 2. Scope of the Complaint

Preliminarily, we note what must be apparent from our lengthy recitation of the procedural history. Over the course of no fewer than *six* separate filings opposing the motion for summary judgment, the theory of plaintiff's case has been entirely transformed. The operative pleading is plaintiff's complaint, which alleged negligence in the diagnosis and treatment of decedent. Before us, however, plaintiff argues that there were violations of the County Manual and JCAHO regulations (regarding the placement of locks on patient room doors), insufficient nursing staff, lack of a psychiatrist, and improper location

of the crash cart—all matters which were *wholly absent* from the allegations of the complaint. " 'The burden of a defendant moving for summary judgment only requires that he or she negate plaintiff's theories of liability *as alleged in the complaint*. A "moving party need not '. . . refute liability on some theoretical possibility not included in the pleadings.' [Citation.]" . . . " '[A] motion for summary judgment must be directed to the *issues raised by the pleadings*. The [papers] filed in response to a defendant's motion for summary judgment may not create issues outside the pleadings and are not a substitute for an amendment to the pleadings.' " ' [Citation.]" (*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 332–333 [40 Cal.Rptr.3d 313].) While we address the merits of those of plaintiff's contentions that were fully and fairly litigated, summary judgment was properly entered with respect to all of plaintiff's arguments which were not supported by allegations in the complaint.

### 3. *Government Code Section 855 Is Limited in Scope*

■ As a general rule, public entity liability only exists if there is an express statutory basis for such liability. "Except as otherwise provided by statute: [¶] (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (Gov. Code, § 815.) An exception is provided by Government Code section 815.6. That section provides, "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty." ■ "Enactment," in turn, is defined to mean "a constitutional provision, statute, charter provision, ordinance or regulation." (Gov. Code, § 810.6.)

We are here concerned, however, not with the general immunity of Government Code section 815 and the exception provided by Government Code section 815.6. Instead, we address a *specific* immunity granted to public entities operating mental institutions. Government Code section 854.8 provides, in pertinent part, "(a) Notwithstanding any other provision of this part, except as provided in . . . [s]ection[] . . . 855 . . . , a public entity is not liable for: [¶] . . . [¶] (2) An injury to an inpatient of a mental institution."[17] Government Code section 855, subdivision (a) provides, "A public entity that operates or maintains any medical facility that is subject to regulation by the

---

[17] Subdivision (d) of Government Code section 854.8 notes that "[n]othing in this section exonerates a *public employee* from liability for injury proximately caused by his negligent or wrongful act or omission." (Italics added.) It further provides that the public entity need not indemnify any public employee for such liability, with the exception that the public entity *shall*

State Department of Health Services, Social Services, Developmental Services, or Mental Health is liable for injury proximately caused by the failure of the public entity to provide adequate or sufficient equipment, personnel or facilities required by any statute or any regulation of the State Department of Health Services, Social Services, Developmental Services, or Mental Health prescribing minimum standards for equipment, personnel or facilities, unless the public entity establishes that it exercised reasonable diligence to comply with the applicable statute or regulation." Government Code section 855, subdivision (a) "is a specific application of the general policy established in [Government Code] section 815.6." (*Baber v. Napa State Hospital* (1989) 209 Cal.App.3d 213, 218 [257 Cal.Rptr. 55].)

Plaintiff argues that the exception to immunity provided by Government Code section 855 should not be limited to the breach of duties set forth in statutes or regulations of the State Department of Health Services, Social Services, Developmental Services, or Mental Health, but should instead apply to the breach of duties specified by *any* authority, including federal regulations, the County Manual, and JCAHO standards.

" 'A court's overriding purpose in construing a statute is to ascertain legislative intent and to give the statute a reasonable construction conforming to that intent. [Citation.] In interpreting a statute to determine legislative intent, a court looks first to the words of the statute and gives them their usual and ordinary meaning.' [Citation.] 'If the language is clear and unambiguous, the plain meaning of the statute governs.' [Citation.] 'The words of a statute must be construed in context and provisions relating to the same subject matter must be harmonized to the extent possible.' " (*Gonzalez v. Paradise Valley Hospital* (2003) 111 Cal.App.4th 735, 740–741 [3 Cal.Rptr.3d 903].)

In this case, the statutory language is clear and unambiguous. The exception to immunity provided by Government Code section 855 applies only to the violation of certain statutes and regulations enacted by four specified departments. Had the Legislature intended for the exception to apply to violations of any "enactments," it could have done so in the language used in Government Code section 815.6. Indeed, Government Code section 855 was enacted as part of the same Government Tort Liability Act which enacted Government Code section 815.6. (Stats. 1963, ch. 1681, § 1, p. 3266.) Clearly, the Legislature chose to use the general term "enactment" in Government Code section 815.6, but the more restrictive "any statute or any regulation of the State Department of Health Services, Social Services,

pay any judgment based on a claim of medical malpractice against a licensed practitioner of the healing arts. Plaintiff sued only *County*; he never attempted to bring suit against any of County's employees.

Developmental Services, or Mental Health" in Government Code section 855.[18] There is absolutely no indication that the limited language was meant to encompass any entities other than those specifically described.[19]

We therefore conclude that Government Code section 855 means what it says. A plaintiff seeking to avoid public entity immunity under its terms must rely on a statute or regulation of the State Department of Health Services, Social Services, Developmental Services, or Mental Health; enactments by other bodies are irrelevant. Unless a statute or regulation of one of those four departments sets forth the standard allegedly breached, or incorporates it by reference, there can be no liability. In this case, plaintiff relies on various federal regulations, the County Manual,[20] and the JCAHO standards.[21] None are within the scope of Government Code section 855, therefore, none can form the basis of liability.

---

[18] When Government Code section 855 was first enacted, it applied only to statutes or regulations promulgated by the State Department of Public Health or the State Department of Mental Hygiene. A 1978 amendment replaced the language with the current administrative authorities. (Stats. 1978, ch. 429, § 49.5, p. 1357.)

[19] The Law Revision Commission comment on Government Code section 855 states, "This section imposes liability upon a public entity operating or maintaining medical facilities where the public entity fails to comply with applicable minimum standards for equipment, personnel or facilities, unless the public entity establishes that it exercised reasonable diligence to comply. The minimum standards for equipment, personnel or facilities may be established by statute or by regulations promulgated by the State Department of Public Health or the State Department of Mental Hygiene." (Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 855, p. 484.) Clearly, had the statute been intended to be interpreted as plaintiff suggests, the second sentence would not have been present.

[20] In his brief on appeal, plaintiff also argues that there were violations of King/Drew's own policies and procedures manual. A facility's own manual does not even constitute an "enactment" for the purposes of Government Code section 815.6. (Wilson v. County of San Diego (2001) 91 Cal.App.4th 974, 982 [111 Cal.Rptr.2d 173].)

[21] Plaintiff repeatedly argues that Hawkins was required to comply with JCAHO standards due to its status as a Medicare provider. Plaintiff misinterprets the law. "Institutions accredited as hospitals by the JCAHO . . . are deemed to meet all of the Medicare conditions of participation . . . ." (42 C.F.R. § 488.5(a) (2006).) In other words, JCAHO accreditation is an *alternative means* of establishing Medicare conditions of participation; JCAHO accreditation is not a *requirement* for Medicare participation. This was clearly set forth in the Federal Register, when comments were solicited on JCAHO's application to be considered an accreditation organization. The Centers for Medicare and Medicaid Services explained that the law "permits 'accredited' hospitals to be exempt from routine surveys by State survey agencies to determine compliance with Medicare conditions of participation. *Accreditation by an accreditation organization is voluntary and is not required for Medicare participation.*" (67 Fed.Reg. 13344, italics added.) Thus, no statute or regulation requiring that Hawkins maintain its eligibility to participate in Medicare can be read as incorporating a requirement that Hawkins maintain JCAHO accreditation, as JCAHO accreditation is simply one alternative means of satisfying Medicare conditions of participation. Plaintiff has never identified a statute or applicable regulation *requiring* Hawkins to comply with JCAHO standards.

### 4. *Statutes or Regulations Must Set Forth Specific Minimums to Trigger Liability Under Government Code Section 855*

■ Government Code section 855 does not provide liability when the public entity violates *any* statute or regulation of the State Department of Health Services, Social Services, Developmental Services, or Mental Health. Instead, it applies only to violations of those statutes and regulations that "prescrib[e] minimum standards for equipment, personnel or facilities." (Gov. Code, § 855, subd. (a).) Many of the regulations on which plaintiff relies to establish liability set forth only general standards. ■ For example, California Code of Regulations, title 22, section 70579, subdivision (e) requires that, for the psychiatric unit in a general acute care hospital, "[t]here shall be sufficient nursing staff, including registered nurses, licensed vocational nurses, licensed psychiatric technicians and mental health workers to meet the needs of the patients."[22] We consider whether such general standards are regulations that "prescrib[e] minimum standards" within the meaning of Government Code section 855.

The Law Revision Commission's recommendations are instructive. "Regarding medical, hospital and public health activities, the Law Revision Commission's recommendations . . . state: 'A public entity should be liable for an injury which results from the failure to comply with an applicable statute, or an applicable regulation of the State Department of [Health Services], which establishes minimum standards for equipment, personnel or facilities in public hospitals and other public medical facilities, unless the public entity establishes that it exercised reasonable diligence to comply with the statute or regulation. Although decisions as to the facilities, personnel or equipment to be provided in public medical facilities involve discretion and public policy to a high degree, nonetheless, when minimum standards have been fixed by statute or regulation, there should be no discretion to fail to meet those minimum standards. [¶] This recommendation will leave determinations of the standards to which public hospitals and other public medical facilities must conform in the hands of the persons best qualified to make such determinations and will not leave those standards to the discretion of juries in damage actions. Hence, public entities will know what is expected of them and will continue to be able to make the basic decisions as to the standards and levels of care to be provided in public hospitals and other public medical facilities within the range of discretion permitted by state statutes and regulations.'" (*Baber v. Napa State Hospital, supra,* 209 Cal.App.3d at p. 218, quoting Recommendations Relating to Sovereign

---

[22] Similarly, plaintiff attempts to establish liability based on Hawkins's failure to meet JCAHO standards requiring "a plan for a safe environment" and "staff oriented to and educated about their environment, and possess[ing] the knowledge and skills to perform their responsibilities in the environment."

Immunity, No. 1, Tort Liability of Public Entities and Public Employees (Jan. 1963) 4 Cal. Law Revision Com. Rep. (1963) pp. 829–830.) It is clear, then, that Government Code section 855 was not intended to interfere with the exercise of a public medical facility's discretion to make decisions as to the standards and levels of equipment, personnel and facilities to be provided, or to impose liability when the public medical facility's exercise of discretion resulted in injury. Instead, Government Code section 855 was intended to impose liability only when the statute or regulation sets forth a specific standard that gives the public medical facility clear notice as to the minimum requirements with which it must comply.

■ We are guided by case law interpreting Government Code section 815.6, as Government Code section 855 is a specific application of the general policy established in Government Code section 815.6. Government Code section 815.6 applies when a public entity "is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury." "An enactment creates a mandatory duty if it requires a public agency to take a particular action. [Citation.] ■ An enactment does not create a mandatory duty if it merely recites legislative goals and policies that must be implemented through a public agency's exercise of discretion." (*County of Los Angeles v. Superior Court* (2002) 102 Cal.App.4th 627, 639 [125 Cal.Rptr.2d 637].) Thus, for example, a regulation requiring a social worker to monitor a child placed outside the home " 'and take necessary actions to safeguard the child's growth and development while in placement . . .' . . . sets forth general policy goals for the social worker, but does not specifically direct the manner in which the goals will be attained. It creates no mandatory duty." (*Id.* at pp. 642–643.)

■ Similarly, we conclude that a regulation requiring "sufficient nursing staff . . . to meet the needs of the patients" sets forth only a general goal within which a public medical facility may exercise its discretion, not a specific minimum standard giving clear notice of the minimum amount of nursing personnel the facility must supply. It sets forth the general policy goal for staffing the psychiatric unit, but does not specifically direct the manner in which that goal is to be attained. This is not the type of regulation "prescribing minimum standards for equipment, personnel or facilities," the breach of which can give rise to liability under Government Code section 855.

In this regard, we disagree with the conclusion reached by Division Five of the First District Court of Appeal in *Baber v. Napa State Hospital, supra,* 209 Cal.App.3d 213. In that case, the plaintiff sought to hold the defendant public entity liable under Government Code section 855 for the violation of Department of Health Services regulations providing " '[t]here shall be

adequate space maintained to meet the needs of the [medical] service,' " " '[a] sufficient number of appropriate personnel shall be provided for the safety of the patients,' " "[t]he hospital's governing body shall '[p]rovide appropriate physical resources and personnel required to meet the needs of the patients,' " and " '[t]he hospital shall be clean, sanitary, and in good repair at all times. Maintenance shall include provision and surveillance of services and procedures for the safety and well-being of patients, personnel and visitors.' "[23] (209 Cal.App.3d at p. 220.) The *Baber* court concluded that these standards were not "insufficiently 'quantifiable' or objective to support liability" under Government Code section 855. (209 Cal.App.3d at p. 220.) The court rested its conclusion on the theory that when the Health and Safety Code entrusted rulemaking authority to administrative agencies, it granted authority for broad, variable standards. (See Health & Saf. Code, § 1276.) The *Baber* court stated that "[t]his implies an understanding by the Legislature of the necessity of creating standards flexible enough to meet the variety and changing needs of psychiatric hospitals and patient populations."[24] (*Baber v. Napa State Hospital, supra*, 209 Cal.App.3d at p. 220.) We agree that the Legislature understood that flexible standards were justified in this situation. However, the issue is not the validity or propriety of the regulations promulgated; the issue is whether those regulations "prescrib[e] minimum standards for equipment, personnel or facilities" such that their breach gives rise to tort liability. Indeed, the Law Revision Commission's recommendations *also* acknowledged that "decisions as to the facilities, personnel or equipment to be provided in public medical facilities involve discretion," but indicated that liability would only be imposed "when minimum standards have been fixed by statute or regulation."

 In sum, the plain language of Government Code section 855 clearly states that not all statutory or regulatory violations will provide a basis for liability, only those that prescribe minimum standards. We conclude that, as with enactments setting forth a "mandatory duty" allowing for liability under Government Code section 815.6, regulations sufficient to establish liability under Government Code section 855 must require something specific of the public entity, and not simply set forth a goal, leaving it to the entity's discretion as to how to meet that goal.

---

[23] The *Baber* plaintiff also alleged violation of regulations requiring a telephone be available for patient use. As these regulations set forth an actual minimum equipment requirement, we do not disagree with *Baber*'s conclusion that violation of these regulations could be a basis for liability under Government Code section 855.

[24] The court went on to conclude that the plaintiff could perhaps establish violation of these broad standards with "correspondence, directives, inspection reports or other official memoranda indicating more specifically what was required of the hospital during the relevant time period. There may also be industry standards which were understood to apply." (*Baber v. Napa State Hospital, supra*, 209 Cal.App.3d at p. 221.)

### 5. *No Triable Issue of Fact Exists*

We now address the contentions in this case. Plaintiff concedes that County is immune under Government Code section 854.8, and that he can only proceed if he can fall within the scope of Government Code section 855. Plaintiff attempts to create liability under Government Code section 855 for violations of, among other things, JCAHO standards, federal regulations, and the County Manual. As we have discussed above, plaintiff cannot proceed on the basis of any of these authorities, as they are not "statute[s] or . . . regulation[s] of the State Department of Health Services, Social Services, Developmental Services, or Mental Health." (Gov. Code, § 855, subd. (a).)

Plaintiff also attempts to create liability under several California regulations. Those regulations which require "adequate" or "sufficient" equipment, personnel or facilities cannot provide a basis for liability, as they do not "prescrib[e] minimum standards for equipment, personnel or facilities."

Three regulations remain. Plaintiff asserts County violated California Code of Regulations, title 22, section 71611, regarding locked doors. That regulation applies to acute psychiatric hospitals, not psychiatric units in general acute care hospitals. As such, Hawkins was not bound by it, and its breach cannot support a cause of action. The governing regulation is California Code of Regulations, title 22, section 70811. That section provides, in pertinent part, "Except in rooms approved by the Department for detention and for psychiatric patients, patients' rooms shall not be kept locked when occupied."[25] (Cal. Code Regs., tit. 22, § 70811, subd. (e).) The undisputed evidence in this case is that decedent's room was not, in fact, locked. While plaintiff argues that the regulation should be interpreted to apply to bathrooms, he has presented no basis on which we could conclude that it does. Even if it did, it appears to us that the regulation was intended to prohibit hospitals from *locking patients in,* not to prohibit hospitals from allowing patients to use "privacy locks."[26] In short, the regulation was not violated.

Second, plaintiff asserts County violated California Code of Regulations, title 22, section 70581, subdivision (b), which provides, "Resuscitative and cardiac monitoring equipment shall be in or readily available to the unit." The undisputed evidence in this case was that the crash cart was not only stored in the psychiatric unit, but in ward B, where decedent had been housed. The regulation was simply not violated. Plaintiff's concern seems to be "that

---

[25] The regulation relied upon by plaintiff, for acute psychiatric hospitals, adds, "Where patients are kept in locked wards or rooms, adequate staff must be available to assure safe and quick egress of the patients." (Cal. Code Regs., tit. 22, § 71611, subd. (g).)

[26] Nor has plaintiff offered any reason why the exception "for psychiatric patients" does not apply.

additional time elapsed between the time [decedent] was noted to be locked in the bathroom until resuscitation equipment was brought to the unit and resuscitation efforts began." In other words, plaintiff's dispute is not with the storage location of the crash cart, but with the nursing staff's decision not to bring it to decedent's room until the bathroom door had been opened and decedent's condition had been assessed. This does not constitute a violation of the regulation.

Thirdly and finally, plaintiff asserts County violated California Code of Regulations, title 22, section 70579, subdivision (a), by failing "to have [a] licensed psychiatrist providing services to decedent." The regulation provides as follows: "If a psychiatrist is not the administrative director of the psychiatric unit, a psychiatrist who is certified or eligible for certification in psychiatry by the American Board of Psychiatry and Neurology, shall be responsible for the medical care and services of the unit, including all those acts of diagnosis, treatment, or prescribing or ordering of drugs which may only be performed by a licensed physician." (Cal. Code Regs., tit. 22, § 70579, subd. (a).) While there is substantial evidence in the record that a psychiatrist was indeed involved in decedent's care, we reject plaintiff's argument because the lack of a psychiatrist was not alleged in plaintiff's complaint. The regulation indicates that a psychiatrist "shall be responsible for the medical care" only "[i]f a psychiatrist is not the administrative director of the psychiatric unit." As plaintiff never alleged the lack of a psychiatrist in his complaint, County was not on notice that, in order to obtain summary judgment, it would need to establish either that the administrative director of Hawkins was a psychiatrist or that a psychiatrist was responsible for the medical care and services at Hawkins. Plaintiff cannot defeat summary judgment by raising a triable issue of fact as to a claim defendant never knew it had to address.

## CONCLUSION

Decedent's death by suicide was tragic. It is all the more tragic in that his death might have been preventable, had the nursing staff at Hawkins been aware that the bathroom door could have easily been opened. Nonetheless, it is apparent that County has immunity for decedent's death under Government Code section 854.8. Plaintiff, having been given six bites at the apple, has completely failed to identify any statute or regulation meeting the terms of Government Code section 855 which could support liability in accordance with the allegations made in his complaint. We therefore affirm.

## DISPOSITION

The judgment is affirmed. County is to recover its costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

On September 19, 2007, and October 4, 2007, the opinion was modified to read as printed above.