[No. B210693. Second Dist., Div. Three. Apr. 7, 2010.]

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; TAMI WATERS et al., Real Parties In Interest.

## COUNSEL

Marlin & Saltzman, Louis M. Marlin, Alan S. Lazar and Lynn P. Whitlock for Petitioner.

No appearance for Respondent.

Kiesel Boucher Larson, Raymond P. Boucher, Michael Eyerly; Arias, Ozzello & Gignac, Mick M. Arias and Arnold C. Wang for Real Parties In Interest.

## OPINION

**KITCHING, J.—**

### INTRODUCTION

Plaintiffs Chiquita Waters, Tami Waters, and Victor Waters are the children of Ruth Waters, who enrolled in the University of California at Los Angeles (UCLA) "Willed Body Program" in 1970 and whose body was donated to that program upon her death in 2001. Plaintiffs sued the Regents of the University of California (the Regents) for negligence because of alleged wrongdoing and mishandling of donated bodies by the UCLA Willed Body Program.

 Based on the recent California Supreme Court case of *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244 [91 Cal.Rptr.3d 532, 203 P.3d 1127] (*Conroy*), we find that the document of gift executed by Ruth Waters gave UCLA the right to use her body for teaching purposes, scientific research, "or such purposes as [UCLA] shall in [its] sole discretion deem advisable." That document of gift contained no provision regarding disposition of her body or remains, and representations made by the UCLA Willed Body Program to plaintiffs did not create additional duties owed to

them. Under *Conroy*, execution of a document of gift causes the statutory right to control disposition of a donor's remains to pass to the donee (here the UCLA Willed Body Program) upon the donor's death. The donee becomes the statutory right holder and has the exclusive right to control disposition of the decedent donor's remains. (*Id.* at p. 1255.) In addition, under the Uniform Anatomical Gift Act (UAGA) (Health & Saf. Code, § 7150[1] et seq.), the donee's rights created by an anatomical gift are superior to the rights of others, and family members, such as plaintiffs, do not have the right to alter terms of the written donation agreement executed by the donor. Because Ruth Waters's donation was "irrevocable" upon her death, plaintiffs could not enter into an agreement with UCLA regarding Ruth Waters's body, and representations UCLA made to plaintiffs did not create a duty to them.

The Regents petition for a writ of mandate directing the trial court to set aside its order denying the Regents' motion for summary judgment. The trial court denied the Regents' motion, but ordered that the Regents' petition for writ be certified to this court on several issues, which included whether a willed body program owed duties to donors' family members based on the UAGA, and specifically, whether a claim could be stated for negligence based on the Willed Body Program's representations and information communicated to the donor's family members, either before or after a donation.

We conclude that the absence of a duty owed by defendant to plaintiffs requires the grant of summary adjudication as to the negligence cause of action. We grant the petition and order a writ of mandate to issue directing the trial court to set aside its order denying the Regents' motion for summary judgment as to plaintiffs Chiquita Waters, Tami Waters, and Victor Waters, and to enter an order granting the Regents' motion for summary adjudication as to the negligence cause of action.

## FACTUAL AND PROCEDURAL HISTORY

Ruth Waters, the mother of plaintiffs Chiquita, Tami, and Victor Waters[2] (sometimes the Waters plaintiffs), had worked on cadavers when she attended nursing school. She told Chiquita and Victor that working on cadavers had been of enormous benefit in her training to be a nurse, and that it was important for her to donate her body to medical science. Ruth Waters told

---

[1] Unless otherwise specified, statutes in this opinion will refer to the Health and Safety Code.

[2] Because Ruth, Victor, Tami, and Chiquita Waters share the same surname, for ease of reference this opinion will sometimes refer to them individually by their first names. We mean no disrespect. (*In re Marriage of Barthold* (2008) 158 Cal.App.4th 1301, 1304, fn. 1 [70 Cal.Rptr.3d 691].)

Chiquita, Victor, and the rest of her family of her intent to donate her body, told them when she had enrolled, and was very clear with respect to her intent to donate.

Ruth Waters executed a donation agreement on October 3, 1970, which stated: "I hereby state that it is my wish to donate my body to the Department of Anatomy, School of Medicine, of the University of California at Los Angeles, immediately following my death, for teaching purposes, scientific research, or such purposes as the said University or its authorized representative shall in their sole discretion deem advisable. My body, when delivered to UCLA, should be unembalmed and unautopsied and intact." Tami testified in her declaration that her mother's expectation was always that her donated body would be used only in the school of medicine, and that her mother wanted it used only for student research. Chiquita also testified that it was her mother's impression that only UCLA staff and medical students would use the donated body.

Plaintiffs did not assist or facilitate Ruth Waters's donation, obtain forms for her to sign, or object to her donation. Ruth Waters never expressed any change of heart or mind about her decision to donate her body and it remained her intent to donate until she died.

Plaintiffs stated that UCLA represented to Ruth Waters that only UCLA medical staff and students would have access to donated remains; that after studies were completed, remains were individually cremated; and that cremated remains were scattered at El Toro Memorial Park, at a cemetery, or at sea, or were returned to the family. Plaintiffs stated that UCLA made these representations in documents sent to donors entitled "The Gift of Knowledge," "General Information," and "Frequently Asked Questions," which UCLA asked donors to share with family members.

UCLA instructed donors to inform family members of the donation request and the donor's wishes. One instruction stated: "Tell your family or intimates that should your death occur, the Department of Anatomy is to be called *promptly*, day or night and including holidays. We will arrange to have the body picked up and brought to the University." Another instruction stated: "Retain the other copy of the Will Form with your personal papers. Inform your family, and attorney and/or physician of this bequest, and be sure they are familiar with the list of instructions."

In another document provided to donors, UCLA stated: "Survivors will derive comfort from the knowledge that dignity and respect for those who have donated their bodies is maintained at all times. The indispensable contribution that participants in the Willed Body Program have made is fully recognized. Only medical faculty, students, staff, or students in health-related professions are authorized to have access to donated remains. [¶] . . . [¶] Routinely after use, the remains are cremated and scattered in a rose garden at El Toro Memorial Park, Lake Forest, California."

Literature UCLA provided to donors stated: "Does the University offer payment for a donated body? Never. State law prohibits the sale of bodies or body parts."

Victor, Tami, and Chiquita had no discussions with UCLA about the donation before Ruth Waters's death. Before her mother's death, Tami received no information from UCLA about the Willed Body Program, and did not see "The Gift of Knowledge" or "Frequently Asked Questions." Ruth showed her donation documents to Chiquita, but Chiquita did not read them before Ruth's death. Chiquita did recall reading the "Instruction for How to Will One's Body" before Ruth's death. In the late 1990's, Chiquita looked up the UCLA Willed Body Program on the Internet, where she read about the program and read that donated bodies were for the use of medical staff, students, and faculty. She recalled nothing else she learned from the Internet about the program. Victor never saw any document of gift or any documents the donor may have had regarding the donation, except that he had glanced at a donor card that went with his mother's driver's license. He did not obtain any information from UCLA about the Willed Body Program before his mother's death.

Ruth Waters died on July 14, 2001, at age 71. A coordinator at the hospital where Ruth Waters died made arrangements to transport the body to UCLA.

After Ruth Waters's death, Tami received a thank you letter informing her that after study of her mother's donated body was completed, it would be cremated and her mother's cremated remains would be scattered at El Toro Memorial Park. A year after her mother's death, Tami telephoned UCLA because she had received no information about what had happened. She was told UCLA was still using the remains and they might use them for up to three years. Based on the letter she received from UCLA and her telephone conversation with a representative of UCLA, Tami expected that she would be notified upon final disposition of her mother's remains. Based on what Tami was told, Chiquita also expected her mother's remains would be cremated and scattered at El Toro Memorial Park. Tami told Victor that

UCLA promised Ruth Waters's cremains[3] would be scattered at El Toro Memorial Park. The document known as "Application and Permit for Disposition of Human Remains" represents that Ruth Waters's body was cremated on July 3, 2002, contradicting the information that UCLA gave to Tami in her July 14, 2002, phone conversation with the UCLA representative.

Tami first learned of alleged wrongdoing at the UCLA Willed Body Program from Chiquita, who learned of those allegations from a television news report in 2004, when she saw Ernest Nelson and Henry Reid[4] being arrested. Chiquita received a letter in April 2004 from the vice chancellor of medical research regarding allegations of misuse of donated remains. Victor first learned of those allegations from media reports in late 2003 or early 2004.

Plaintiffs instituted this action against the Regents and against three corporate entities which were alleged to have improperly purchased donated tissue from UCLA. Plaintiffs Tami, Chiquita, and Victor Waters consented to and adopted the third amended master complaint for negligence and intentional infliction of emotional distress filed by other plaintiffs.

The third amended master complaint alleged that since 1997, Harry Reid, Director of the Willed Body Program, and other employees engaged in improper sale of donated bodies and body parts for profit to defendants Johnson & Johnson, DePuy Mitek, Inc. (Mitek), and NuVasive, Inc.

The complaint alleged that in 2003, California's State Department of Health Services determined that NuVasive was receiving cadaveric material from UCLA's Willed Body Program. On March 7 and 8, 2004, Reid and Nelson were arrested on charges stemming from sale of bodies and body parts from the UCLA Willed Body Program. By court order, the UCLA Willed Body Program was shut down. UCLA issued statements apologizing for causing pain and suffering to donors' family members.

The negligence cause of action alleged that UCLA employees induced decedents to will their bodies to UCLA for medical and scientific purposes, and undertook the duty to handle and dispose of decedents' remains in a

---

[3] Cremains: "the ashes of a cremated human body." (Merriam-Webster's Collegiate Dict. (10th ed. 1995) p. 273.)

[4] A criminal grand jury indicted Henry Reid and Ernest Nelson, two key actors in events giving rise to this litigation. Reid, the head of the UCLA Willed Body Program, allegedly arranged sales of donated remains for his personal benefit. Nelson allegedly acted as a go-between to procure donated remains from the UCLA Willed Body Program and sell them to for-profit corporations. At the time of the summary judgment proceeding, the pending criminal case made testimony by Reid and Nelson unavailable for use by parties to this litigation.

manner that would not shock plaintiffs' sensibilities. The complaint alleged that UCLA promised decedents and represented to plaintiffs that decedents' bodies would be handled and disposed of in a proper, dignified manner or that decedents' ashes would be scattered in a rose garden, and that decedents' bodies and body parts would not and could not be sold.

The negligence cause of action alleged that UCLA relied on plaintiffs to read documents UCLA provided to the donor, to notify UCLA of decedents' deaths, to refrain from having decedents' bodies autopsied or embalmed or otherwise disposing of decedents' bodies, and to arrange for UCLA to pick up decedents' bodies. The complaint alleged that UCLA created a relationship between itself and plaintiffs by instructing donors to inform relatives of their donation of remains to the Willed Body Program, by having survivors carry out donors' intentions, and by making public statements that decedents' bodies would be treated and disposed of properly. The complaint alleged that the Regents owed plaintiffs the duty to handle decedents' bodies according to cremation and funeral industry standards, to ensure decedents' remains would not be sold, and to act with ordinary care regarding use and disposition of decedents' remains. The complaint alleged the Regents breached these duties, failed to handle and dispose of decedents' remains properly, and conspired to engage in illegal sales of donated bodies and body parts for profit.

A cause of action for intentional infliction of emotional distress alleged that placement of remains in an El Toro Memorial Park rose garden was a fiction told to donors and their families to induce them to donate. The complaint alleged that donors were told that bodies would be handled with dignity and respect and would not be sold, and donors passed these false promises to their families. The complaint alleged that UCLA then mishandled and disposed of donated bodies and caused plaintiffs to suffer serious emotional distress.

*The Regents' Motion for Summary Judgment*: In a stipulation and order approved by the trial court and filed on April 3, 2008, counsel for plaintiffs and for the Regents entered into a stipulation to permit the Regents to bring motions for summary judgment on specific issues. The parties sought to determine whether plaintiffs' claims could survive a summary judgment motion based on factual and legal arguments raised by the Regents which did not depend on the testimony of indicted witnesses Reid and Nelson. These issues were:

1. Whether plaintiffs had standing to assert their claims, an issue which could be stated as an issue of duty: whether the Regents owed plaintiffs any duties that would have been breached by the wrongdoing alleged in the complaint;

2. Whether Government Code section 815 made the Regents immune from liability for these claims; Government Code section 815 provided that the Regents were liable for statutory breaches, but not for common law claims; and

3. Whether plaintiffs had evidence of legally sufficient damages to support their claims.

The parties agreed that a decision in favor of the Regents on any of these issues as to any plaintiff was potentially dispositive as to that plaintiff's claims or case. If the court found against the Regents on these issues, the parties agreed that remaining issues in defendant's summary judgment motions should be continued until it was determined whether discovery of Reid and Nelson could be completed. Pursuant to this stipulation the Regents brought their motion for summary judgment, or in the alternative for summary adjudication of issues as to individual causes of action for negligence and for intentional infliction of emotional distress, against the Waters plaintiffs.

*The Trial Court's Denial of the Regents' Summary Judgment Motion*: The trial court denied the Regents' summary judgment motion.[5] The trial court found that Government Code section 815 did not provide immunity for the Regents, and that the Waters plaintiffs provided evidence sufficient to allow a jury to make a finding of severe emotional distress.

The trial court also found that plaintiffs provided evidence that UCLA restricted its use of the anatomical gift and had a duty to conform to those restrictions, and denied summary judgment. We discuss the trial court's reasoning, *post*.

*Petition for Writ of Mandamus*: Pursuant to Code of Civil Procedure section 166.1, the parties stipulated and the trial court ordered that the petitions for writ be certified to the Court of Appeal on the issue of whether, and to what extent, a Willed Body Program owed duties to donors' family members based on the UAGA, and specifically, inter alia, whether a claim could be stated for negligence based on alleged misrepresentations and alleged inaccurate information provided by the Willed Body Program to the donor's family, either before or after a donation; whether immunities provided in the UAGA insulated the Regents from any liability; and under what circumstances a donor's family under the UAGA could amend or modify the terms of a donation. Pursuant to Code of Civil Procedure section 437c, subdivision (m)(1), the Regents filed a petition for peremptory writ as to the

---

[5] The trial court denied summary judgment before issuance of *Conroy, supra*, 45 Cal.4th 1244, on April 6, 2009.

summary judgment motion denied by the trial court. This court determined that the issues raised in the petition were novel and important issues of law which warranted appellate review, and ordered the parties to appear to show cause why the relief requested in the petition should or should not be granted.

## ISSUES

The Regents' petition claims that:

1. The UAGA controls this matter and prohibits the maintenance of the action that is the subject of this petition; and

2. The trial court's order is contrary to the UAGA, which gives the donor the power to dictate the terms of the donation to the exclusion of the donor's next of kin.

## DISCUSSION

### 1. *Standard of Review*

This court reviews orders granting or denying a summary judgment motion de novo. "We exercise 'an independent assessment of the correctness of the trial court's ruling, applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' [Citation.]" (*Lockhart v. County of Los Angeles* (2007) 155 Cal.App.4th 289, 303 [66 Cal.Rptr.3d 62].) " 'A trial court properly grants summary judgment where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.' [Citation.] The materiality of a disputed fact is measured by the pleadings [citations], which 'set the boundaries of the issues to be resolved at summary judgment.' [Citations.]" (*Conroy, supra*, 45 Cal.4th at p. 1250.)

### 2. *The Regents Owed No Duty to Plaintiffs*

#### a. *The Cause of Action for Negligence and the Evidence*

■ To establish liability for negligence, a plaintiff must prove duty, breach, causation, and damages. (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [114 Cal.Rptr.2d 470, 36 P.3d 11].)

In denying the Regents' summary judgment motion, the trial court relied on evidence of representations by UCLA to plaintiffs, Ruth Waters's family members, which restricted UCLA's use of the anatomical gift. On the

Internet, Chiquita Waters viewed representations by UCLA that medical staff, students, and faculty would use donated bodies. In a telephone communication with UCLA after her mother's death, Tami Waters was led to understand that UCLA students would use her mother's body in the study of human anatomy and that after its use her mother's remains would be cremated and her ashes spread in a rose garden at El Toro Memorial Park. Victor Waters stated that his sister communicated to him UCLA's promise that Ruth Waters's remains would be scattered at El Toro Memorial Park. The trial court found that these representations and statements by UCLA—made not to the donor, Ruth Waters, but to her children—created a duty to handle Ruth Waters's body in a manner consistent with UCLA's Internet representations; to use Ruth Waters's donated remains only for the education of UCLA students; and to cremate Ruth Waters's remains after use and to spread the cremains in the El Toro Memorial Park rose garden. The trial court found this evidence sufficient to overcome the summary judgment motion.[6] *Conroy* leads us to disagree with the denial of summary judgment.

 b. Conroy *Held That the Regents Had No Duty to the Surviving Relatives of a Willed Body Donor*

 In *Conroy*, the California Supreme Court rejected the arguments plaintiffs make in this case. *Conroy* was also a willed body case, in which a donor executed a document of gift to the University of California. The University of California made various representations to the donor's relative and then allegedly mishandled the donor's remains. Like the plaintiff in *Conroy*, plaintiffs here are surviving relatives of a willed body donor whose remains have been allegedly mishandled. Also like the plaintiff in *Conroy*, plaintiffs in this case allege that the Regents made representations to them about the use and disposition of donated remains and then failed to comply with those representations. Finally, like the plaintiff in *Conroy*, plaintiffs here argue that those representations created legal duties, including a duty to avoid causing foreseeable emotional harm to the donor's family members. The Supreme Court rejected these arguments and held that the UAGA and the document of gift defined the Regents' duties and that representations made by the University of California to the donor's family did not amend the document of gift. (*Conroy, supra*, 45 Cal.4th at pp. 1253–1254.) We note that the *Conroy* document of gift was nearly identical to the document of gift executed by Ruth Waters. Both provided, inter alia, that the Regents could use donated remains for "teaching purposes, scientific research, or such purposes as the . . . University . . . shall in [its] sole discretion deem advisable." (*Id.* at pp. 1247–1248.)

---

 [6] As noted previously, the trial court made its ruling before the California Supreme Court issued *Conroy*.

In *Conroy*, the plaintiff's husband executed an agreement to donate his body to the University of California at Irvine (UCI) Willed Body Program. That donation agreement stated: " 'I here state that it is my wish to donate my body to the Department of Anatomy and Neurobiology, College of Medicine, University of California, Irvine (UCI), immediately following my death, for teaching purposes, scientific research, or such purposes as the said University or its authorized representative shall in their sole discretion deem advisable. My body, when delivered to UCI, will be unembalmed and in good condition. It is further understood and agreed that final disposition of my body by UCI shall be in accordance with the State Code.' " (*Conroy, supra*, 45 Cal.4th at pp. 1247–1248.) The husband later died and his body was delivered to UCI. Approximately nine months later, the plaintiff saw news reports of misconduct at the UCI Willed Body Program, and called UCI to inquire about her husband's body. The program's interim director later told the plaintiff that the previous director failed to keep proper records and that UCI did not know what happened to her husband's body after it was delivered to UCI. The plaintiff then sued the Regents, alleging that as holder of the statutory right to control disposition of her husband's body, she had entrusted it to the defendants under the UCI Willed Body Program for teaching and research purposes; that upon completion of the educational and research purposes for which the donation was made she was to receive her husband's remains; that plaintiff discovered that the defendants used cadavers donated to the UCI Willed Body Program for unauthorized purposes, including private for-profit tutoring classes and transporting and dismembering of bodies for profit; that the defendants failed to maintain records to ensure cadavers were used only for authorized purposes and to enable return of remains to family members; and that her husband's body was misused in that the university did not use it for medical research. (*Id.* at p. 1248.)

The defendants moved for summary judgment on causes of action for negligence, negligent misrepresentation, and fraud and intentional deceit. The plaintiff's opposition to the motion attached her declaration recounting a phone conversation with the director of the UCI Willed Body Program that took place before her husband executed the donation agreement. In that conversation, the director told the plaintiff that after UCI completed its research, her husband's body would be cremated and the ashes scattered at sea, the family would be notified so they could take part in scattering those ashes at sea, and that the plaintiff and her husband's physician would be advised of medical findings pertaining to her husband's body. The plaintiff's opposition also submitted evidence that the prior director had owned or colluded with several companies that profited from sales and use of donated cadavers. (*Conroy, supra*, 45 Cal.4th at pp. 1248–1249.)

The trial court granted the Regents' motion for summary judgment, the Court of Appeal affirmed, and the California Supreme Court also affirmed. We find that *Conroy* controls this case.

i. *The UAGA Defines the Rights and Duties Associated with an Anatomical Gift*

As in *Conroy*, plaintiffs in this case alleged that based on UCLA's promises and representations to Ruth Waters and to plaintiffs, Ruth Waters's donation of her body created a duty to handle and dispose of decedent's remains in a proper, dignified manner that would not shock plaintiffs' sensibilities. *Conroy*, however, rejected the existence of this duty, based on the terms of the document of gift and on UAGA statutes. (*Conroy, supra*, 45 Cal.4th at p. 1255.)

 Once Ruth Waters had executed the donation agreement and upon her death, the statutory right to control disposition of her body passed to UCLA, pursuant to former sections 7150.5, subdivision (h) and 7154, subdivision (a).[7] (*Conroy, supra*, 45 Cal.4th at p. 1255.) Former section 7154, subdivision (a) stated, in relevant part: "Rights of a donee created by an anatomical gift are superior to rights of others . . . ." As the statutory rights holder, UCLA had " 'the exclusive right to control the disposition of the remains.' " (*Conroy*, at p. 1255.) Section 7100.1, subdivision (a) states, in relevant part: "A decedent, prior to death, may direct, in writing, the disposition of his or her remains and specify funeral goods and services to be provided. Unless there is a statement to the contrary that is signed and dated by the decedent, the directions may not be altered, changed, or otherwise amended in any material way, except as may be required by law . . . ." Thus the terms of a written donation supersede the rights of statutory rights holders (who are defined in § 7100) to control disposition of the decedent's body. (*Conroy*, at p. 1257.) Close family members, such as plaintiffs Chiquita, Tami, and Victor Waters, do not have the legal right to alter the written donation agreement executed by Ruth Waters. Because Ruth Waters's donation was "irrevocable" upon her death, plaintiffs did not enter into an agreement with UCLA regarding her body, and representations by UCLA did not cause plaintiffs to alter their legal relations with UCLA. (*Ibid.*) The UAGA " ' "recognizes and gives legal effect to the right of the individual to dispose of his own body without subsequent veto by

---

[7] Former section 7150.5, subdivision (h) stated: "An anatomical gift that is not revoked by the donor before death is irrevocable and does not require the consent or concurrence of any person after the donor's death."

Former section 7154, subdivision (a) stated, in relevant part: "Rights of a donee created by an anatomical gift are superior to rights of others except with respect to autopsies under subdivision (b) of Section 7155.5."

others." ' " (*Conroy*, at p. 1257, quoting 8A West's U. Laws Ann. (2003) Anatomical Gift Act (1987) com. to § 2, pp. 26–27.) As former section 7150.5, subdivision (h) stated, "An anatomical gift that is not revoked by the donor before death is irrevocable and does not require the consent or concurrence of any person after the donor's death."[8] Defendant Regents owed no duty to plaintiffs regarding disposition of decedent's body.

 ii. *The Terms of the Document of Gift, Executed Pursuant to the UAGA, Subject to State Law, Are the Only Enforceable Restrictions on a Donation; Representations Outside the Document of Gift Did Not Amend or Alter the Donation Agreement and Created No Duty to Plaintiffs*

The trial court found that the Regents did not breach either the requirements of the UAGA or the terms of the donation agreement. Plaintiffs thus base their claims of negligence on representations made to them by UCLA which were not found in the UAGA or the donation agreement.

The plaintiff in *Conroy* similarly alleged that representations UCI made to her concerning disposition of her husband's remains created legally enforceable duties to her. The *Conroy* court rejected that argument and held that representations made outside the document of gift cannot create legal duties. (*Conroy, supra*, 45 Cal.4th at p. 1253.) *Conroy* looked to the terms of the written donation agreement to determine the duties that would be imposed on the donee, and found that the only enforceable restrictions on a donation were those found in the terms of the document of gift executed in accordance with the UAGA. (*Conroy*, at p. 1253.) The donation agreement did not specify that remains were to be returned to the plaintiff. Therefore *Conroy* rejected the plaintiff's allegation that the Regents breached their duty to return her husband's ashes to her following use of the donated body. (*Ibid.*)[9]

---

[8] Former section 7150.5, subdivision (h) was repealed in 2007 (Stats. 2007, ch. 629, § 1), and was replaced by section 7150.35, subdivision (a): "Except as otherwise provided in subdivision (g) and subject to subdivision (f), in the absence of an express, contrary indication by the donor, a person other than the donor is barred from making, amending, or revoking an anatomical gift of a donor's body or part if the donor made an anatomical gift of the donor's body or part under Section 7150.20 or an amendment to an anatomical gift of the donor's body or part under section 7150.25."

[9] The provision of the UAGA in effect at the time of the donation of Mr. Conroy's body, moreover, did not require return of his remains. Although section 7151.40, subdivision (b) required the donee to return the decedent's cremated remains unless the donor previously designated otherwise in the document of gift, this provision applied only to donations made pursuant to a donation agreement executed after January 1, 2001. *Conroy* stated that the California Supreme Court was "loath to expand a donee's duties in this area beyond those the Legislature has provided." (*Conroy, supra*, 45 Cal.4th at p. 1254.) Thus the UAGA did not require return of remains of a body donated before January 1, 2001.

The document of gift executed by Ruth Waters did not state that after use of her body, the UCLA Willed Body Program was required to spread those cremated remains in a rose garden at El Toro Memorial Park, and the document of gift made no other provision for disposition of that body after use by the UCLA Willed Body Program. Because Ruth Waters executed her donation agreement before January 1, 2001, the UAGA did not require return of her cremains, and did not give family members the right to specify the final disposition of the donee's remains. Consequently oral, Internet, or other representations not found in the document of gift created no duty owed by the Regents to Chiquita, Tami, and Victor Waters regarding disposition of Ruth Waters's remains. Enforcing such duties would violate section 7100.1, subdivision (a), prohibiting alteration, change, or amendment of a decedent's written disposition of his or her remains.

*Conroy* also rejected the plaintiff's claim that the Regents breached their duty to maintain adequate records to ensure that donated bodies were used in accordance with the purpose for which a donation was made. "Such a duty appears inconsistent with the donation agreement itself, which allows UCI to use the body 'for teaching purposes, scientific research, or such purposes as the said University or its authorized representative shall in their sole discretion deem advisable . . . .' " (*Conroy, supra*, 45 Cal.4th at p. 1254.) The donation agreement executed by Ruth Waters contained this language. The donation agreement imposes the only limitation on the donee's exclusive right to control disposition of donated remains. (*Id.* at p. 1255.) The rejection of a duty to maintain adequate records corresponds to *Conroy*'s rejection of the duty to return remains, which would necessarily require keeping records of donated bodies; without such record keeping, it would not be possible to return remains or cremains.

In order to conduct a willed body program, the recipient of an anatomical donation under a document of gift and the UAGA must be certain of the terms, conditions and limitations with regard to any donation. *Conroy* rejected the imposition of duties on the donee of a decedent's body when those duties have no source in the donation agreement or in state law. Permitting family members to impose additional obligations on the Regents would violate the holding of *Conroy*.

 iii. Conroy *Rejected Imposition of a Duty on the Donee to Handle and Dispose of a Donor Decedent's Remains in a Manner That Would Not Shock Plaintiffs' Sensibilities*

As the Waters plaintiffs alleged in their complaint, the plaintiff in *Conroy* alleged that her husband's donation of his body to the UCI Willed Body Program created " 'a duty to dispose of the remains in a manner that would

not shock the sensibility [of] family members.' " (*Conroy, supra,* 45 Cal.4th at p. 1255.) *Conroy,* however, rejected the existence of this duty. This is because upon execution of the donation agreement and upon her husband's death, the statutory right to control disposition of his body passed to UCI pursuant to former sections 7150.5, subdivision (h) and 7154, subdivision (a). Thus the donee became the statutory right holder, and acquired " 'the exclusive right to control the disposition of the remains, and may do so in a manner offensive to other family members.' " (*Conroy,* at p. 1255.) "State law . . . does not impose a duty on UCI to conduct its teaching and research in such a way as to safeguard the sensibilities of the surviving family members. 'Even where not mishandled, bodies donated to the [Willed Body Program] are routinely subjected to treatment that could foreseeably cause emotional distress to family members. . . . But the Legislature has made a policy decision based on the importance of medical education and research that universities may act in the manner described above, and [has] expressly exempted them from the myriad of laws governing funeral directors.' " (*Ibid.,* quoting *Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168, 181 [59 Cal.Rptr.3d 672].) The donation agreement imposes the only limitation on that right to control disposition of the remains. (*Conroy,* at p. 1255.)

Pursuant to *Conroy,* therefore, representations made by UCLA to the Waters plaintiffs concerning cremation of Ruth Waters's remains and the spreading of those cremains in a rose garden at El Toro Memorial Park imposed no duty on defendant.

### 3. *Conclusion*

We conclude that the absence of a duty owed by defendant to plaintiffs requires the grant of summary adjudication as to the negligence cause of action. We therefore do not need to address the other grounds for the trial court's order.

## DISPOSITION

The petition is granted. Let a writ of mandate issue directing the trial court to set aside its order denying the motion of defendant Regents of the University of California for summary judgment as to plaintiffs Chiquita Waters, Tami Waters, and Victor Waters, and to enter an order granting the motion of defendant Regents of the University of California for summary adjudication as to the negligence cause of action. Costs are awarded to defendant Regents of the University of California.

Aldrich, J., concurred.

**CROSKEY, Acting P. J.,** Dissenting.—I respectfully dissent.

The majority relies on *Conroy v. Regents of University of California* (2009) 45 Cal.4th 1244 [91 Cal.Rptr.3d 532, 203 P.3d 1127] (*Conroy*) in holding that representations made to plaintiffs concerning the use and disposition of the decedent's body created no duty of care as a matter of law. I believe that *Conroy* does not support the majority's holding and is not dispositive as to the existence or nonexistence of a duty of care arising from representations made outside of the donation agreement.

The decedent in *Conroy, supra,* 45 Cal.4th 1244, signed an agreement donating his body to the Willed Body Program at the University of California at Irvine (UCI). The agreement stated that the donation was " 'for teaching purposes, scientific research, or such purposes as the said University or its authorized representative shall in their sole discretion deem advisable.' " (*Id.* at pp. 1247–1248.) It also stated, " 'that final disposition of my body by UCI shall be in accordance with the State Code.' " (*Id.* at p. 1248.) The agreement contained no other express limitation on the use or disposition of the decedent's body. The plaintiff alleged that UCI's agents had promised to return the remains to her (*id.* at p. 1248; see also *id.* at p. 1253), and that they had represented that the donated body "would be used for research and teaching purposes (and not for gain or profit) and that the body would at all times be handled in a respectful and dignified manner" (*id.* at p. 1256). The plaintiff also presented evidence in opposition to the defendant's summary judgment motion that the director of the Willed Body Program had orally represented to her before her husband signed the donation agreement that his body would be cremated and the ashes scattered at sea, that the family would be notified so they could take part in the ceremony, and that she and her husband's physician would be notified of the medical findings pertaining to her husband's body. (*Id.* at pp. 1247–1248.)

*Conroy, supra,* 45 Cal.4th 1244, addressed several potential bases for negligence liability in reviewing the summary judgment, including liability based on (1) the use of donated bodies in private, for-profit tutoring classes; (2) the sale of body parts for profit; (3) the failure to ensure that use of the donated bodies conformed with the purpose of the donation; (4) the failure to return the remains to plaintiff; (5) the failure to notify plaintiff of the scattering of ashes; (6) the failure to maintain adequate records to ensure that the bodies were used in accordance with the purpose of the donation; and (7) the failure to dispose of the remains in a manner that would not shock the sensibilities of surviving family members. *Conroy* did not hold with respect to any of these bases for liability that a representation made outside of the donation agreement created no duty of care as a matter of law. Instead, *Conroy* disposed of each basis for negligence liability on some other ground:

*Conroy, supra,* 45 Cal.4th 1244, concluded that the plaintiff could not establish liability based on the use of donated bodies in private tutoring classes, sale of body parts for profit, or failure to ensure that use of the donated bodies conformed with the purpose of the donation because there was no evidence of causation, in that there was no evidence in the record that the decedent's body in particular was used in a private tutoring class, dismembered for profit, or otherwise mishandled (i.e., no causation).[1] (*Conroy,* at pp. 1251–1252.) *Conroy* concluded that the plaintiff could not establish liability based on the failure to return the remains because the donation agreement did not state that the remains would be returned to the plaintiff, and the plaintiff's own declaration showed that no such representation was made outside of the donation agreement (i.e., no representation). (*Id.* at p. 1253.)

*Conroy, supra,* 45 Cal.4th 1244, concluded that the plaintiff could not establish liability based on the failure to notify her of the scattering of ashes because she failed to allege that theory of liability in her complaint. (*Id.* at pp. 1253–1254.) *Conroy* stated that to the extent the alleged duty to maintain adequate records was based on a duty to return the remains, the absence of a duty to return the remains defeated the claim. (*Id.* at p. 1254.) *Conroy* stated that to the extent the alleged duty to maintain adequate records was not based on a duty to return the remains, there was no basis for such a duty either in the donation agreement or under the Uniform Anatomical Gift Act (former Health & Saf. Code, §§ 7150–7156.5), and such a duty would be inconsistent with the rights granted to UCI in the donation agreement.[2] (*Conroy, supra,* at pp. 1254–1255.)

*Conroy, supra,* 45 Cal.4th 1244, also rejected the argument that the donation itself created a duty to dispose of the remains in a manner that would not shock the sensibilities of surviving family members.[3] As the statutory right holder, UCI had the exclusive right to control the disposition of the decedent's body, limited only by the provision in the donation agreement that the disposition " 'shall be in accordance with the State

---

[1] *Conroy, supra,* 45 Cal.4th 1244, reaffirmed the need to establish a direct causal connection between the defendant's misconduct and the plaintiff's injury and " 'a well-founded substantial certainty that [the plaintiff's] decedent's remains were among those reportedly mistreated.' " (*Id.* at p. 1251, quoting *Christensen v. Superior Court* (1991) 54 Cal.3d 868, 902 [2 Cal.Rptr.2d 79, 820 P.2d 181] (*Christensen*).)

[2] The plaintiff in *Conroy, supra,* 45 Cal.4th 1244, did not allege that UCI had represented that it would maintain adequate records, so *Conroy* did not discuss whether such a representation could create a duty of care.

[3] The plaintiff in *Conroy, supra,* 45 Cal.4th 1244, did not allege that UCI had represented that it would dispose of the remains in a manner that would not shock the sensibilities of surviving family members. *Conroy* therefore did not discuss whether such a representation could create a duty of care.

Code.' " (*Conroy*, at p. 1255.) The Legislature had exempted UCI and other medical schools, hospitals, and public institutions from the Funeral Directors and Embalmers Law (Bus. & Prof. Code, § 7609), and state law imposed no duty on UCI to conduct its teaching and research in a manner that would "safeguard the sensibilities of the surviving family members." (*Conroy, supra,* at p. 1255.)

Thus, *Conroy, supra,* 45 Cal.4th 1244, did not hold with respect to any of the alleged bases for negligence liability discussed in the majority opinion that only representations made in the donation agreement could create a duty of care as a matter of law. Several of the alleged bases for negligence liability arose in whole or in part from representations made outside of the donation agreement. *Conroy* never stated that such representations could not create a duty of care as a matter of law, but instead found other reasons to affirm the summary judgment.[4] I believe that the majority's characterization of *Conroy* as holding that representations made outside of the donation agreement created no duty of care as a matter of law is simply not supported by anything that the Supreme Court actually said or held in *Conroy*.

I also find no support for the majority's conclusion of no duty in Health and Safety Code section 7100.1, subdivision (a) (see maj. opn., *ante,* at p. 767), which states that if certain requirements are met, the directions provided by a decedent as to the disposition of his or her remains "may not be altered, changed, or otherwise amended in any material way, except as may be required by law, and shall be faithfully carried out upon his or her death." That the remains must be disposed of as directed by the decedent does not mean that a donee cannot be held liable in tort for damages resulting from unfulfilled promises or representations. (Cf. *Christensen, supra,* 54 Cal.3d at p. 891, fn. 19.)[5] An award of damages in these circumstances would in no way amend the donation agreement or affect the disposition of the remains. The question here is not whether representations made by defendant's agents can be specifically enforced despite the rights granted to defendant under the donation agreement, but whether defendant can be liable in tort for emotional distress caused by those representations.

---

[4] *Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168 [59 Cal.Rptr.3d 672], which also involved UCI's Willed Body Program, is also distinguishable. *Melican* held that the defendant, in voluntarily returning the decedent's cremated remains, had no duty to ensure that the remains were not commingled with those of other decedents. (*Id.* at pp. 180–181.) The plaintiffs in *Melican* did not allege that UCI had represented that the remains would be segregated (see *id.* at p. 180), and *Melican* did not discuss whether such a representation could create a duty of care.

[5] "We recognize that the statutory right holder has the exclusive right to control the disposition of the remains, and may do so in a manner offensive to other family members. [Citation.] This does not preclude liability to those other family members for whose benefit the services were to be performed." (*Christensen, supra,* 54 Cal.3d at p. 891, fn. 19.)

The majority also relies in part on the statement in *Conroy, supra*, 45 Cal.4th at page 1257, that the representations did not cause the plaintiff to alter her legal relations with UCI. (Maj. opn., *ante*, at p. 767.) This statement concerns the element of reliance and appears in the part of *Conroy* discussing fraud and negligent misrepresentation, rather than the part of the opinion discussing negligence. (*Conroy, supra*, at pp. 1256–1257.) Reliance is not an essential element of a negligence cause of action. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 500 [110 Cal.Rptr.2d 370, 28 P.3d 116].) The absence of reliance as required to establish liability for deceit does not preclude the existence of a duty of care for purposes of negligence liability.

Damages for severe emotional distress may be recovered in a negligence action if the defendant assumed a duty of care to the plaintiff in which the emotional condition of the plaintiff was an object, a duty is imposed on the defendant as a matter of law, or a duty arises out of a special relationship between the two. (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 985 [25 Cal.Rptr.2d 550, 863 P.2d 795]; *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1073 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) Defendant here assumed a duty to plaintiff's close relatives by making representations concerning the use and disposal of the decedent's donated body. In these circumstances, consideration of the factors set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113 [70 Cal.Rptr. 97, 443 P.2d 561], supports the existence of a duty to avoid negligently causing emotional harm arising from representations made outside of the donation agreement.

It was clearly foreseeable that plaintiffs would suffer severe emotional distress if they learned that their decedent's donated body was used and disposed of in a manner contrary to the representations allegedly made to them. The moral blame of making such inaccurate representations or failing to ensure that the donated body was used and disposed of as represented is substantial. The imposition of a duty of care would discourage similar misconduct in the future and therefore would further the policy of preventing future harm. The burden on a donee to ensure the accuracy of representations made to close family members concerning the use and disposal of a donated human body or to ensure that the donated body is used and disposed of as represented would not be so great as to suggest that the imposition of a duty of care would be inappropriate. Moreover, there is no indication that the imposition of a duty would significantly impair the ability of a donee to obtain donated bodies for medical research or that the community would suffer as a result. Finally, it seems likely that insurance would be available to protect a donee from liability for negligence in these circumstances.

I therefore conclude that defendant owed plaintiff a duty of care and is not entitled to summary adjudication of the negligence count based on the absence of a duty of care. In my view, the denial of the summary judgment motion was proper.

The petition of real parties in interest for review by the Supreme Court was denied June 23, 2010, S182748.