Filed 5/19/23  Walton v. Bd. of Trustees of City College of San Francisco CA1/4

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TRUDY WALTON,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>BOARD OF TRUSTEES OF CITY COLLEGE OF SAN FRANCISCO,<br><br>Defendant and Respondent. | A164637<br><br>(City & County of San Francisco Super. Ct. No. CGC-20-584880) |

Trudy Walton appeals from an adverse judgment following the trial court's Code of Civil Procedure section 437c determination that there are no triable issues of material fact on her claims against the Board of Trustees of City College of San Francisco (CCSF) for race and age discrimination and for retaliation.  (Gov. Code,[1] § 12940, subds. (a) & (h) (Fair Employment and Housing Act (FEHA)).)  We shall affirm.

## I. BACKGROUND

### A. *The Hiring of Walton as Vice Chancellor*

Walton, an African-American woman, worked for CCSF as an independent contractor pursuant to an Agreement for Professional Services

---

[1] Unless otherwise specifically designated, statutory references are to the Government Code.

1

from August 2017 through December 2017.  Under that Agreement, Walton served as the Interim Vice Chancellor of Student Development while CCSF sought a permanent hire for the position.  As of January 1, 2018, CCSF hired Walton into the position as an employee, making her the permanent Vice Chancellor of Student Development.

The Vice Chancellor of Student Development (later renamed Vice Chancellor of Student Affairs) is the top administrator at CCSF for the Student Development/Services Division.  The person in this office reports to the Chancellor and directly supervises two Associate Vice Chancellors. Within the Student Development/Services Division are various deans, including the Dean for Community Outreach, Enrollment & Student Engagement, for Student Activities, for Financial Aid & Special Programs, for Admissions & Records, and for Matriculation & Counseling.  The job description states that "The Vice Chancellor provides leadership and supervision of administrators and staff working in . . . Student Development areas serving credit and noncredit students at all District locations."

## B. *The Holmberg Investigation*

Shortly after Walton assumed the position of Vice Chancellor of Student Development, CCSF received the first of a series of complaints about her.  In May 2018, an employee under her supervision, Julia Lingad, filed a workers' compensation claim.  Lingad had worked for CCSF for over 20 years. She reported "stress due to new supervisor" (Walton) who was "unduly hard on her."  CCSF hired an outside firm, Holmberg and Associates, to investigate the claim.

Holmberg took statements from seven witnesses and obtained documents, including emails from Walton to Lingad.  According to Holmberg's June 2018 report, Lingad stated that Walton assigned an excessive workload, did not give her clear instructions on tasks, often forgot

previous instructions, gave last-minute changes in instructions, and spontaneously transferred Lingad to another work location to help Dean Lidia Jenkins while hiring a younger, Caucasian woman to move into Lingad's workstation.

Other employees reported similar experiences. For example, Dean Jenkins reported that Walton was "unclear about how to give directives, and she is not very gracious when it comes to admitting she does not know something," and that Walton "dump[ed] tasks on [Ms. Lingad] at the last minute, forcing [her] to scramble to try to get them done."

One employee reported that Walton "has shortcomings with her oral and written communication style," "criticizes in a disrespectful manner with harsh words and actions," and is "abusive." Another employee reported that Walton "inappropriately reprimand[ed] subordinates, including [Ms. Lingad], by email and then disseminate[d] those emails to others." Dean Andrew King reported that other subordinates "questioned Walton's experience and qualifications because no clear rationale seems to have been present for the directives she has given."

## C. *Walton's Request To Increase Dr. Duke's Salary*

At the end of June 2018, when discussing cost of living adjustments for administrators in the new fiscal year, Walton emailed then-Vice Chancellor of Human Resources Dianna Gonzales and Associate Vice Chancellor of Human Resources Clara Starr asking to discuss whether the two Associate Vice Chancellors in her division, Dr. Shalamon Duke, an African-American man, and Dr. Elizabeth Coria, a Latina woman, could be paid the same salary.

In her email to Gonzalez and Starr, Walton stated as follows: "Can we discuss the 2 AVCs being at the same step/salary since the intention was to pay them on categorical funds. In addition, Dr. Duke's 15 years of

3

administration experience may justify his equal step/salary. I would like to see if we can do this as we worked hard to secure these positions and pay them with CAT funds." Walton was aware that not all Associate Vice Chancellors are paid the same, and knew of others with different salaries. There was a follow-up phone conversation between Gonzalez, Starr, and Walton, and in that call, Gonzalez denied the request, telling Walton CCSF could not adjust Duke's salary to match Coria's.

### D. *The Meyers Nave Investigation*

In July 2018, CCSF received another complaint from an employee in Walton's division, Rita Tuialu'ulu'u. Tuialu'ulu'u alleged, among other things, that Walton discriminated against her because of her pregnancy. Factually, Tuialu'ulu'u complained that Walton refused to mention her as a coordinator for commencement activities (a project for which she had substantial responsibilities the prior eight years) and that Walton told her " 'we weren't really sure as to what the makeup of the new committee would look like, and also, because we didn't know what your plans were,' " while gesturing at Tuialu'ulu'u's pregnant stomach.

CCSF retained the Meyers Nave law firm to investigate the complaint. The investigator issued a final report in January 2019. The report concluded Tuialu'ulu'u's pregnancy discrimination claim was not substantiated, but concluded Walton made "inappropriate," "disrespectful," and "derogatory" statements to and about Tuialu'ulu'u because of her pregnancy, which "illustrate[] poor decision-making and judgment." The investigator also noted that: (1) Walton "asserted that she had emails and other documentation that would support her responses to the allegations" but "never provided the emails despite being requested to do so"; and (2) Dean King admitted Walton gave him a copy of Tuialu'ulu'u's complaint before his interview for the investigation.

## E. *The Reassignment of Dean Jenkins*

In October 2018, Associate Vice Chancellor Duke emailed Vice Chancellor Gonzales advising he had reassigned Dean Jenkins and intended to move her office from the Ocean Campus to a different campus. He copied Walton, who supervised Duke and Jenkins, on the email. Gonzales responded, stating, "[W]e need to discuss at your earliest convenience. . . . This did not go through HR, nor Cabinet. The Chancellor's been clear in the past about making changes to the organization - administrative changes go through Cabinet, at the very least, HR and then Chancellor."

Soon after this October 2018 email exchange, Gonzales met with Walton, Duke, and Associate Vice Chancellor Coria. During the meeting, Gonzales instructed Walton to rescind the reassignment and return Dean Jenkins to the Ocean Campus immediately. At a follow-up meeting in early November, Chancellor Mark Rocha told Walton to " 'put the toothpaste back in the tube' " and undo the organizational changes made related to Dean Jenkins. He also reiterated there should be no organizational changes within the Division of Student Services without review and approval by the Chancellor, Chancellor's cabinet, and Human Resources. Despite this instruction, Walton never transferred Dean Jenkins back to the Ocean Campus.

## F. *The Placement of Walton on Administrative Leave*

In early December 2018, CCSF learned that Associate Vice Chancellor Duke was the subject of sexual harassment allegations by a student at the community college in Los Angeles where he worked before starting at CCSF. Walton was a member of the committee that hired Duke. Walton had also worked for the same community college district (Los Angeles Community College District) at the same time as Duke.

5

On December 11, 2018, CCSF placed Walton on paid administrative leave while it determined how to move forward. Chancellor Rocha, Vice Chancellor Gonzales, and Associate Vice Chancellor Clara Starr made the decision together. The reason for the leave was the built-up concern about Walton's judgment and management, as reflected in the Holmberg and Meyers Nave investigations, and in her insubordinate refusal to follow the Chancellor's instructions about organizational changes in her division. The lawsuit against Duke was the " 'last straw' " for placing her on paid administrative leave.

While Walton was on leave, her job duties were shared by several CCSF employees, including Vice Chancellor Gonzales, Associate Vice Chancellor Coria, and Vice Chancellor Tom Boegel.

## G. *The Cognetta/RPCC Contracts and the Sperry Investigation*

In January 2018, Walton recommended John Cognetta be retained by CCSF as an Interim Dean of Student Activities within her Division. Walton and Cognetta had worked together at De Anza College. Cognetta worked as an independent contractor under two consecutive contracts. The first was between his wife, Freba Cognetta, and CCSF for a sum not to exceed $50,000, in effect for a six-month term (January 2018 to June 2018). Walton signed the contract on behalf of CCSF. The second was between Right Path College Consulting (RPCC) and CCSF for a sum not to exceed $60,000, in effect for a twelve-month term (July 2018 to June 2019). Freba Cognetta was identified as an owner or officer of RPCC.

In early January 2019, halfway through the second contract and soon after Walton was placed on paid administrative leave, Cognetta resigned. In reviewing his contracts, CCSF administration questioned why Cognetta was not a party to the contracts and why he was not an employee. Vice Chancellor Gonzales grew concerned that Cognetta was improperly working

6

as an independent contractor to avoid a reduction in his State Teachers Retirement System (STRS) benefits. She did not want CCSF to be implicated in compliance issues with STRS. She was also concerned that Cognetta had billed $58,250 of the $60,000 allowed during the first half of the year-long contract term.

Again, CCSF retained an outside investigator, the Law Office of Alexander M. Sperry, to investigate these issues. Although Freba and John Cognetta refused to speak to the investigator, Walton agreed to an interview. Her interview was transcribed and provided with the investigator's report. In a May 2019 report, the investigator described Walton's willingness to provide information as "considerably limited." For example, Walton stated she did not recognize Cognetta's second contract, despite emails between her and Gonzales in June 2018 discussing signing Cognetta to another contract.

## H. *The Termination of Walton*

Given the information gleaned from the three independent investigations, plus Walton's insubordination, CCSF concluded Walton did "not possess the high level of professionalism, managerial skills, integrity or judgment to continue to work effectively as Vice Chancellor of Student Development." On July 9, 2019, CCSF issued a Notice of Intended Termination.

Sent by Starr in consultation with Rocha, Gonzales, and CCSF's general counsel, Steve Bruckman, the Notice of Intended Termination provided examples of Walton's "unfitness" to serve, particularly: (1) her failure to obtain the Chancellor's approval for organizational changes, which was "not only insubordinate, but demonstrates a lack of willingness to work collegially at the highest level of District management"; (2) her "unprofessional, disrespectful, derogatory and inappropriate" conduct toward District staff, which was "completely unacceptable for a high management

7

level public employee"; and (3) her lack of cooperation, credibility, and honesty in District investigations, which "demonstrates that you lack the integrity required to serve as Vice Chancellor."

The Notice of Intended Termination advised Walton that, although her position did not entitle her to a *Skelly*[2] hearing before termination, as a courtesy CCSF would provide her with a "pre-disciplinary hearing before a neutral decision-maker." Walton was age 59 at the time she was terminated.

## I. *The* Skelly *Hearing and the Hiring of a Replacement*

At the ensuing *Skelly* hearing in August 2019, the hearing officer was JoLani Hironaka from the San Francisco Unified School District Human Resources Department. Walton provided verbal statements and documents for review at the hearing. After reviewing the evidence, Hironaka issued a letter upholding the termination decision. She concluded that "reasonable grounds exist" to believe the charges described in the Notice of Intended Termination "support the proposed termination."

After Walton's termination, the position of Vice Chancellor of Student Development was renamed Vice Chancellor of Student Affairs. Despite the new name, the position remained substantially the same. The duties for Vice Chancellor of Student Affairs are nearly identical to the duties for Vice Chancellor of Student Development. Each is the "apex" administrator position in the Student Development/Services Division, reporting directly to the Chancellor, supervising six to eight deans, and overseeing a wide range of student services.

In December 2020, CCSF hired Dr. Lisa Cooper Wilkins for Walton's position as the Vice Chancellor for Student Affairs. Dr. Cooper Wilkins is an African-American woman who was age 53 when hired. She has a Ph.D. in

---

[2] *Skelly v. State Personnel Board* (1975) 15 Cal.3d 194.

higher education administration and over two decades of experience in college administration.

## J. *This Lawsuit and Summary Judgment for CCSF*

Walton brought suit in this case in June 2020, initially asserting seven causes of action against CCSF and Rocha. After a series of demurrers, Rocha was dismissed and the only remaining causes of action, both alleged under FEHA, were for discriminatory treatment based on race, gender, and age, and for retaliation.

On CCSF's motion for summary judgment, the court entertained argument and made the following remarks: "I gotta say that I don't think I've ever seen such a comprehensive record for . . . an adverse employment action as we've got in this case. [¶] We've got outside law firms doing investigations; [¶] We have all kinds of allegations; [¶] We have -- some of those allegations being found to be proven. [¶] It's all set out here. I'm not going to repeat it all. But there are about . . . six, seven, eight different grounds for this termination."

The court granted summary judgment for CCSF. The court noted Walton's opposition papers failed to address most of the issues raised by CCSF's motion and presented no evidence to support her various factual assertions. The court found that Walton failed to present evidence that a similarly situated employee of different race or gender was treated differently, or that a younger person replaced her. The court also noted Walton failed to produce evidence of pretext. As for retaliation, the court found Walton's question about equalizing Duke's and Coria's salaries might give rise to an inference she was engaging in protected activity, but there was no evidence that an adverse action was substantially motivated by retaliatory animus.

9

Following this summary judgment ruling, the court entered judgment for CCSF, and Walton appealed.

## II. DISCUSSION

### A. *Governing Legal Standards*

"The standards for granting summary judgment are well settled and easily delineated. A trial court must grant a motion for summary judgment 'if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' (Code Civ. Proc., § 437c, subd. (c).) When, as here, defendants move for summary judgment, they can 'meet their burden by demonstrating that "a cause of action has no merit," which they can do by showing that "[o]ne or more elements of the cause of action cannot be separately established . . . ." ' " (*In re Automobile Antitrust Cases I & II* (2016) 1 Cal.App.5th 127, 150.)

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) Procedurally, a moving defendant bears " 'an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact.' " (*Borders Online v. State Bd. of Equalization* (2005) 129 Cal.App.4th 1179, 1187.) Once the defendant has made a prima facie showing, the plaintiff must then produce sufficient evidence to demonstrate a triable issue of material fact. (*Id.* at pp. 1187–1188.)

Within this procedural framework, neither party may rely on the allegations or denials in the pleadings, but must set forth specific facts showing whether a triable issue of material fact exists. (Code Civ. Proc., § 437c, subd. (p)(1), (2); see *Horn v. Cushman & Wakefield Western, Inc.* (1999) 72 Cal.App.4th 798, 805.) A triable issue of material fact is not raised

10

by speculation or mere possibility. (*Lyons v. Security Pacific Nat. Bank* (1995) 40 Cal.App.4th 1001, 1014.) Supporting and opposing affidavits must be based on personal knowledge, must set forth admissible evidence, and must demonstrate that the affiant is competent to testify to the matters stated in them. (Code Civ. Proc., § 437c, subd. (d).)

"Our review of an order granting summary judgment is de novo, and we must consider all the evidence set forth in the moving and opposing papers except evidence to which objections were made and sustained. [Citation.] Because this case comes before us after the trial court granted a motion for summary judgment, we consider the evidence in the record before the trial court when it ruled on that motion. We liberally construe the evidence in support of the party opposing summary judgment [citation], and assess whether the evidence would, if credited, permit the trier of fact to find in favor of the party opposing summary judgment . . ." (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1109), " 'applying the same legal standard as the trial court in determining whether there are any genuine issues of material fact or whether the moving party is entitled to judgment as a matter of law.' " (*Lockhart v. County of Los Angeles* (2007) 155 Cal.App.4th 289, 303.)

To state a prima facie case of race or age discrimination under section 12940, subdivision (a), the plaintiff must offer evidence that (1) she was a member of a protected class; (2) she was qualified for the position she sought or was performing competently in the position she held; (3) she suffered an adverse employment action; and (4) some other circumstance suggests discriminatory motive. (*Slatkin v. University of Redlands* (2001) 88 Cal.App.4th 1147, 1158.) Discriminatory intent is a necessary element of a racial or age discrimination claim under section 12940, subdivision (a). To avoid summary judgment, the plaintiff must present "substantial responsive

11

evidence" that the moving employer's evidence is insufficient, or that "there is a triable issue of fact material to the employer's motive." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433.)

A plaintiff alleging a racially motivated termination must typically show the employer replaced her with someone who was not a member of the same protected status. (*Brown v. McLean* (4th Cir. 1998) 159 F.3d 898, 905, citing *St. Mary's Honor Center v. Hicks* (1993) 509 U.S. 502, 506.) Evidence the employer replaced the plaintiff with a member of the same protected status weighs against any inference of discrimination. (*Begnal v. Canfield & Associates, Inc.* (2000) 78 Cal.App.4th 66, 76.)

Retaliation claims under section 12940, subdivision (h) are analyzed using a similar but slightly different three-step test. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) First, the employee has the initial burden to establish a prima facie case of retaliation. (*Ibid.*) If the employee does so, the burden then shifts to the employer to produce sufficient evidence that the action was taken for a legitimate, nonretaliatory reason. (*Ibid.*) If the employer produces this evidence, the burden then shifts back to the employee to demonstrate a triable issue of fact regarding whether the employer's ostensible nonretaliatory reasons for its actions were pretextual. (*Ibid.*) The prima facie case for retaliation under section 12940, subdivision (h) requires an employee to prove that: "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz, supra,* 36 Cal.4th at p. 1042.) On this step, a causal link may be inferred from circumstantial evidence that the employer knew of the complaints and that the protected activity occurred close in time to the adverse employment action. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 69.)

12

**B.** *Analysis*

At the threshold, we note that Walton fails to support her arguments on appeal with adequate citations to the record. For virtually all the factual assertions she makes in her opening brief, she points to nothing more than the allegations of her first amended complaint (which is not even the operative complaint) and her brief opposing summary judgment. For that reason alone, her appeal fails. Even if we were inclined to overlook this basic deficiency in Walton's presentation on appeal and undertake our own review of the summary judgment record, it appears to us there is a reason for Walton's cavalier treatment of the record: What she did contest in CCSF's statement of undisputed facts fails to contradict any of the reasons given in CCSF's Notice of Intended Termination, as sustained in the *Skelly* hearing.

Turning first to the discriminatory treatment claim, CCSF produced ample evidence of undisputed, legitimate nondiscriminatory reasons for terminating Walton, thus shifting the burden to her to show a triable issue of material fact on pretext. The dispositive issue here turns on whether she produced enough evidence to meet that burden. In opposition to summary judgment Walton pointed to a few factual disputes surrounding some aspects of CCSF's version of the facts, largely on the strength of her own declaration. For example, she claimed that Lingad was incompetent; that Meyers Nave found Tuialu'ulu'u's claim of pregnancy discrimination unsubstantiated; that she had no knowledge of the harassment charges levelled at Dr. Duke; that Gonzalez knew of the Cognetta/RPCC contracts; and that in any event Cognetta did what he was hired to do.

Granting all of that, we conclude that none of these disputes is material. Walton's theory of racial animus is that she was placed on paid administrative leave three days after discussing with Gonzales and Bruckman sexual harassment allegations against Dr. Duke stemming from

13

his employment with the Los Angeles Community College District. Drawing an inference from the timing alone, Walton argues CCSF tried to hold her responsible for Duke's actions simply because they had both worked at LACCD and she and Duke are both African-American.[3]

Dr. Duke was involved in one of the most significant incidents leading up to Walton's compelled leave and ultimately to her termination—her insubordination in refusing to rescind the transfer of Dr. Jenkins. There is no evidence that anyone blamed her for Duke's alleged misconduct or that the race of the two of them had anything to do with the discipline meted out to her. Her subjective belief about what motivated CCSF to cite the allegations against him as the " 'last straw' " in her case is speculative. (*King v. United Parcel Service, Inc.*, *supra*, 152 Cal.App.4th at pp. 433–434 ["plaintiff's evidence must relate to the motivation of the decision makers to prove, by nonspeculative evidence, an actual causal link between prohibited motivation and termination"].)

Walton insists she is entitled to argue to a jury that there is a causal connection between CCSF's alleged racial animus and the decision to punish her, for one reason: Temporal proximity. But courts are "hesitant to find pretext or discrimination on temporal proximity alone," instead looking for "proximity in conjunction with other evidence." (*Sprenger v. Federal Home*

---

[3] At oral argument, Walton's counsel argued that, under Education Code section 87623, subdivision (a), CCSF should have provided Walton with reasons before placing her on administrative leave. Although Walton made brief reference to this statute in her appellate briefs, she did not develop a separate argument on the point. In any event, any deficiency in the notice of administrative leave does not alter our conclusion that, based on the record as a whole, there is no triable issue of fact as to Walton's discrimination and retaliation claims.

14

*Loan Bank of Des Moines* (8th Cir. 2001) 253 F.3d 1106, 1114.)[4]  Not only is there no other evidence of discriminatory intent here, but CCSF's concern about Walton's performance *before* the discussion about Duke's sexual harassment allegations "undercuts the significance of the temporal proximity."  (*Smith v. Allen Health Systems, Inc.* (8th Cir. 2002) 302 F.3d 827, 834.)

In *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 334, 353, a FEHA disability discrimination case that cites both *Sprenger* and *Smith*, the court explained that, while temporal proximity, by itself, *could* establish a prima facie case of discrimination or retaliation, "temporal proximity alone is not sufficient to raise a triable issue as to pretext once the employer has offered evidence of a legitimate, nondiscriminatory reason for the termination.  [Citations.]  This is especially so where the employer raised questions about the employee's performance *before* he disclosed his symptoms, and the subsequent termination was based on those performance issues."  (*Id.* at p. 353.)

The cases Walton relies upon do not hold otherwise.  *Allen v. Iranon* (9th Cir. 2002) 283 F.3d 1070 and *Coszalter v. City of Salem* (9th Cir. 2003) 320 F.3d 968 are not discrimination cases; they are free speech retaliation cases alleging a violation of the First Amendment.  They explain a retaliatory motive might be established if the proximity in time logically supports an inference the plaintiff was terminated in retaliation for his speech.  (*Coszalter*, at p. 977.*)*  But even in the retaliation context, the Ninth Circuit cautioned that elapsed time cannot be considered "in isolation from other

---

[4] "Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes."  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 354.)

factors" (like the prior performance issues here) and "that a specified time period cannot be a mechanically applied criterion. A rule that any period over a certain time is per se too long (or, conversely, a rule that any period under a certain time is per se short enough) would be unrealistically simplistic." (*Id.* at pp. 977–978.)

To rebut a presumption of unlawful motive created by a prima facie case of discrimination (or retaliation), the employer must show a "legitimate" reason for its actions. (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 356.) " '[L]egitimate' " reasons are "reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination.*" (*Id.* at p. 358.) The reasons need not be wise or correct; they may even be " 'foolish or trivial or baseless,' " so long as they are " 'honestly believed.' " (*Ibid.* (citing cases).) The issue is whether discriminatory animus motivated the employer, not whether the employer is " 'wise, shrewd, prudent, or competent.' " (*Ibid.*)

As the trial court noted, CCSF had many legitimate, nondiscriminatory reasons to place Walton on paid administrative leave and then terminate her employment, and most of those reasons are undisputed. The reasons were described in the Notice of Intended Termination. CCSF knew first-hand about Walton's insubordinate refusal to follow Chancellor Rocha's direction on organizational changes. And all three investigations reported a pattern of abusive, unprofessional, insubordinate, and deceptive conduct for nearly a year before CCSF acted. CCSF had no reason to doubt these investigative reports, and Walton offers no evidence CCSF did not rely on them in good faith. An independent *Skelly* officer even reviewed the evidence and agreed the reasons identified in the Notice of Intended Termination were reasonable grounds for termination.

16

Walton devotes but two paragraphs to her age discrimination claim. To show a prima facie case of age discrimination under FEHA, a plaintiff must present evidence she "(1) is over the age of 40; (2) suffered an adverse employment action; (3) was performing satisfactorily at the time of the adverse action; and (4) suffered the adverse action under circumstances that give rise to an inference of unlawful discrimination, i.e., evidence that the plaintiff was replaced by someone significantly younger than the plaintiff." (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 321.)

Walton failed to meet these prima facie requirements because she was replaced by Dr. Cooper Wilkins who, at 53 when hired, is only a few years younger than Walton (59 when terminated). Walton's arguments that Coria was her real replacement do not persuade. From Walton's administrative leave to the time Dr. Cooper Wilkins was hired, "the duties of [Walton's] position were shared on an interim and temporary basis by several CCSF administrators," including Vice Chancellor Gonzales, Associate Vice Chancellor Coria, and Vice Chancellor Tom Boegel. This is undisputed. In any event, even if Walton had presented a prima facie case of age discrimination, CCSF (as outlined above) presented ample evidence of legitimate, nondiscriminatory reasons for her placement on administrative leave and subsequent termination.

Walton also argues that an early positive evaluation of her performance given to her by Chancellor Rocha must mean later employment decisions were made because of her age. But here again, the time frame is a problem for her. Only six months had elapsed between the date the evaluation was conducted (June 2018) and the date Walton was placed on administrative leave (December 2018), and only 18 months had elapsed between the evaluation and her termination (November 2019). Also, the evaluation period only covered July 1, 2017 to May 11, 2018—*before* any of the independent

17

investigation reports had been issued and *before* she defied Chancellor Rocha's prohibition on administrative reorganizations. Walton offers no evidence Rocha was aware of any ongoing investigation or allegations levied against her when she was evaluated.

As for retaliation, the problem for Walton on this claim is that she fails to show her compelled administrative leave and subsequent termination were connected to "protected activity" on her part. As relevant here, "protected activity" is an action taken by an employee to oppose an employment practice made unlawful by FEHA. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1042.) Walton did make a request to equalize the salaries of Dr. Duke and others, but she said nothing about the salary disparity she sought to address being unlawful. An employee need not use specific " 'buzzwords' " when opposing perceived discrimination, but the words used must " 'sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.' " (*Id.* at p. 1047.) There can be no opposition to unlawful activity if the employee does not articulate a belief the employer's conduct is unlawful. Complaints "about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate" are not protected activity. (*Ibid.*)

For example, in *Barber v. CSX Distribution Services* (3d Cir. 1995) 68 F.3d 694, 702, the court held a letter to an employer's human resources department was not protected activity because it did not clearly complain about age discrimination. The letter stated: "In view of my 21 years of experience in this field (14 years direct sales and 7 years customer service), I am quite puzzled as to why the position was awarded to a less qualified individual. [¶] I would greatly appreciate your response as to why I was not awarded this job." (*Id.* at p. 697.) The court found the letter too vague to constitute opposition to an unlawful employment practice because it neither

18

"explicitly [n]or implicitly" alleged a protected characteristic was the basis for the adverse employment action. (*Id.* at p. 702.) "A general complaint of unfair treatment does not translate into a charge of illegal . . . discrimination." (*Ibid.*)

CCSF cites to various other examples. (See, e.g., *Burch v. Regents of University of California* (E.D.Cal. 2006) 433 F.Supp.2d 1110, 1116, 1126–1127, citing *Barber* [holding coach's "positive advocacy" challenging the University's efforts to phase out women's participation in wrestling program did not equal a complaint of discrimination]; *Jurado v. Eleven–Fifty Corp.* (9th Cir. 1987) 813 F.2d 1406, 1411–1412 [holding plaintiff did not establish he engaged in protected activity when he complained about the impact that an English-only rule would have on his reputation as a radio personality and only alleged this same conduct was discriminatory after he was fired].)

Accordingly, we see no error in the trial court's conclusion that, on this record, Walton failed to raise a triable issue of fact on her FEHA claims.

## III. DISPOSITION

The judgment is affirmed. Costs on appeal shall be awarded to CCSF.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.

19